United States Court of Appeals,

Fifth Circuit.

No. 93-4057.

MARSHALL DURBIN POULTRY COMPANY, Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

Dec. 16, 1994.

Petition for Review and Cross Application for Enforcement of a Decision of the National Labor Relations Board.

Before REAVLEY, GARWOOD and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

Marshall Durbin Poultry Company (the Company) petitions for review of a decision of the National Labor Relations Board (the Board or NLRB), which held that the Company violated §§ 8(a)(1), (3), and (4) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (3), and (4), following a union organizing campaign at its Hattiesburg, Mississippi, plant. The Board has filed a cross-petition for enforcement of its order. We affirm the Board's decision in part and reverse it in part.

## Facts and Proceedings Below

The Company employs approximately four hundred workers at its poultry processing plant in Hattiesburg, Mississippi. In March 1989, several plant employees met with a representative of the United Food and Commercial Workers International Union (the Union) to discuss organizing a union among the Company's Hattiesburg employees. In early 1990, the Union petitioned for an election. Thereafter, on February 22, the Board conducted a representation

hearing at which Myrtle Temple (Temple), Rebecca Cole (Cole), Ruth Powell (Powell), Charlene Jones (Jones), and Patricia Walker (Walker) testified on behalf of the Union. After the hearing, the Board set the election for May 3, 1990. On the day of the election, however, the Union withdrew its petition and the election was cancelled.

In June 1990, the Union filed a complaint with the NLRB alleging that the Company engaged in numerous unfair labor practices.[1] An evidentiary hearing was held thereon before an administrative law judge (ALJ), who issued lengthy findings of fact and conclusions of law. Following exceptions by the Company and the General Counsel, the NLRB affirmed the majority of the ALJ's conclusions and found that the Company had violated section 8(a)(1) of the Act by (1) interrogating employees regarding Union activities; (2) threatening employees with discharge, reduced wages, and other reprisals if they supported the Union; (3) coercively soliciting employees to withdraw support for the Union; and (4) discharging supervisor Johnson for his refusal to commit unfair labor practices. The Board also found that the Company had violated sections 8(a)(1) and (3) by reducing its employees' work hours. In addition, the Board found that the Company had violated sections 8(a)(1), (3) and (4) of the Act by: (1) issuing disciplinary write-ups to Walker, Barney Chisholm (Chisholm), Cole, Temple, and Jones; (2) constructively discharging Union activist

---

[1]This complaint was later consolidated with a complaint filed by Company supervisor Billy Johnson (Johnson) on October 9, 1990.

Powell; and (3) discharging Union activist Jones.

The Board differed with the ALJ on two points. First, contrary to the ALJ, the Board held that the Company had violated sections 8(a)(1) and (3) "in February 1990" by "delaying" a wage increase to the Hattiesburg plant employees. Second, the Board disagreed with the ALJ's decision regarding supervisor Johnson's back pay. The ALJ had concluded that although Johnson's sexual misconduct was a bar to reinstatement, it was not a bar to his receiving back pay until he found similar employment. The Board, however, determined that Johnson's back pay would terminate as of the date the Company learned of the misconduct.

The Company, asserting that the Board's decision is not supported by substantial evidence, petitioned this Court for review of the NLRB decision. The NLRB cross-petitioned for enforcement of its order.

**Discussion**

I. Standard of Review

"In reviewing the Board's decisions, this court determines, on the basis of the record taken as a whole, whether *substantial evidence* supports the Board's findings." *Texas World Service Co. Inc. v. NLRB,* 928 F.2d 1426, 1430 (5th Cir.1991) (emphasis in original) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera,* 340 U.S. at 477, 71 S.Ct. at 459. "When findings of fact rest upon credibility

3

determinations, we defer to the NLRB's findings and will overturn them only in rare circumstances." *NLRB v. McCullough Environmental Services, Inc.,* 5 F.3d 923 (5th Cir.1993).

II. Discharge of Johnson and Other Section 8(a)(1) Violations

Section 8(a)(1) of the Act provides that it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Section 7 of the Act, 29 U.S.C. § 157, provides, in relevant part, that "[e]mployees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." An employer also violates section 8(a)(1) of the Act by discharging a supervisor in retaliation for his refusal to engage in unfair labor practices. *See Oil City Brass Works v. NLRB,* 357 F.2d 466, 470-71 (5th Cir.1966).

A. Evidence Regarding Johnson's Discharge

The ALJ credited the testimony by supervisor and ten-year employee Johnson that he was directed by Company officials to commit numerous unfair labor practices. Johnson testified that, pursuant to instructions by Company officials, he interrogated employees under his supervision about their Union sentiments and reported his findings to Company management.[2] However, Johnson

---

[2]For example, on the day before the election, Johnson was ordered to write down the names of any employees wearing Union buttons. Johnson found six employees wearing buttons but gave

4

refused to carry out management directives concerning reprisals to be taken against known Union supporters under his supervision. Johnson testified that he was told to (1) follow up on the work of pro-Union employees Temple and Cole to get something on them[3] and (2) plant Company property in the possession of Cole and Temple so they could be fired. In response to these requests, Johnson warned Cole and Temple about the management directives and then reported to McDonald that he could find nothing wrong with Cole's and Temple's work. Johnson stated that on one occasion after he refused to follow the Company's instructions to "cold shoulder" pro-Union employees, he was warned by his immediate supervisor, James Sanders (Sanders), that Varner wanted to get rid of him.

On May 3, 1990, Johnson was called to McDonald's office and told that Varner had ordered that he be discharged. Johnson stated that McDonald commended Johnson on his skills and stated he did not know the reason for the discharge. Johnson stated that he left the plant that morning without being advised of any reason for the discharge. The next day Johnson was told by a fellow supervisor that the Company was stating that it fired him because he was

them an opportunity to remove their buttons before he turned his list over to Plant Manager Malcolm McDonald (McDonald). Two employees removed their buttons, so Johnson only turned in four names.

[3]Johnson testified that on one occasion he was told that Temple had harassed another employee, Renee Bonner (Bonner). He stated he was then directed by Vice-President Scott Varner (Varner) to issue a warning. Johnson testified that after he questioned Bonner about the incident and was told that everything was "okay" between her and Temple, he refused to issue the warning. Thereafter, Varner issued the warning himself.

observed by Personnel Director Mel Dupre (Dupre) with his hands in the pants of fellow employee Annette Fairley (Fairley).[4] Thereafter, Johnson filed a charge with the Equal Employment Opportunity Commission (EEOC).[5] While investigating the EEOC charge, the Company discovered that Johnson had engaged in repeated on-the-job sexual misconduct.[6]

The NLRB credited the testimony of both Fairly and Johnson that the particular alleged incident of sexual misconduct with Fairley never happened. The NLRB, noting that the Company never investigated Dupre's allegation against Johnson, concluded that Johnson was fired for his refusal to take punitive actions against pro-Union employees. Based on the Company's later discovery of sexual misconduct, the NLRB determined that Johnson was not entitled to reinstatement due to his past sexual misconduct and should only receive back pay up to the time the Company discovered his sexual misconduct.

Credible testimony disclosed that Johnson was fired after he refused to: (1) find something wrong with the work of two

---

[4]The Company states that immediately after Dupre reported the incident to Varner, Johnson was fired.

[5]Johnson, a white man, filed the EEOC complaint because he contended he was fired not only for his refusal to commit unfair labor practices, but also due to Company warnings about his dating of African-American women.

[6]The investigation revealed that Johnson had (1) engaged in rough horseplay with employees under his supervision; (2) made sexual comments towards female employees; (3) touched the breasts and buttocks of female employees under his supervision; and (4) attempted to put his hands down the shirt of another female employee.

pro-Union employees; (2) plant Company property on pro-Union employees; and (3) "cold-shoulder" pro-Union employees. Further, the ALJ found that both Fairley and Johnson credibly denied the incident of sexual misconduct alleged by the Company. Hence, we find that there is substantial evidence to support the NLRB's determination that Johnson was fired for his refusal to commit unfair labor practices in violation of section 8(a)(1). In addition, we affirm the NLRB's determination that the Company owes Johnson back pay for the period of time until the Company discovered his sexual misconduct. *See John Cuneo, Inc.,* 298 N.L.R.B. 856, 857 (1990) (terminating an employee's pay on the date that the Company first acquired knowledge of the misconduct).

B. Interrogation, Threats and Other Section 8(a)(1) Violations

The NLRB relied on the testimony of several witnesses to support its conclusion that the Company had committed numerous violations of section 8(a)(1) through interrogation and threats. Credited testimony included: (1) statements of Johnson and two other former supervisors that in March 1990 Varner and two other Company officials met with Hattiesburg supervisors and told them to interrogate employees about their Union sympathies;[7] (2) Johnson's statement that, in accordance with instructions from Company officials, he informed employees that they could get in the

_____

[7]The three supervisors stated that they were given notebooks with which to record employee responses. They testified that after they reported the employee responses to Varner, he used a computer-generated worksheet to rank employees according to their pro- or anti-Union sentiment. During the hearing, Johnson produced the original notebook he used to record the employee comments.

Company's "good graces" by sending a letter withdrawing their support;[8] (3) statements by employees Cole, Temple, Jones, and Eloise Phillips that Varner declared in several employee meetings that the Union could cause pay to go back to minimum wage, which would result in employees losing various benefits; and (4) Cole's statement that in February 1990 McDonald warned her she could lose her job because of her Union activities.

We find that the credited testimony of these witnesses provides substantial evidence to support the NLRB's conclusion that the Company violated section 8(a)(1) by threats, interrogation, and coercive solicitation.

III. Reduction in Employee Working Hours

The Company argues that the Board decision regarding a general reduction in employee working hours is not supported by substantial evidence. The Company contends that the Board failed to adequately address its unrebutted evidence, which showed that plant hours regularly fluctuated throughout the course of the year in Hattiesburg. The Company also argues that its reduction in the "kill rate" (the number of chickens being processed) was due to a record-breaking freeze, which reduced the number of chickens hatched during the spring of 1990. The Company maintains that the Board focused too much on the reduction in the kill rate, rather than evidence regarding actual employee hours.

---

[8]Johnson told the employees to send the letters registered mail, return receipt requested, and give him the receipt. At the hearing McDonald acknowledged that he had received several copies of returned receipts from Johnson.

The NLRB credited the testimony of former supervisors Johnson and James Gurlach (Gurlach) regarding the Company's intent to reduce plant working hours. Johnson and Gurlach both testified that, in February 1990, Assistant Sales Manager Allan Wilburn told them that the Company was cutting back on the kill rate because of the Union. Johnson stated that the next day he questioned Sales Manager Levon Williamson (Williamson) about the reason for the kill rate reduction and Williamson replied that it was because of the Union.[9] Johnson further testified that in mid-April 1990, McDonald told him the Company was going to "starve" the employees to defeat the Union as they had done in a prior union campaign at one of the Company's other plants.[10]

Documentary evidence supporting the NLRB decision includes reports which establish: (1) a substantial decrease in the Hattiesburg kill rate during March and April 1990 in comparison to the previous year; (2) a substantial decrease in the Hattiesburg kill rate in comparison to a similar Company plant in Jasper, Alabama; (3) a number of day-long plant closings during the three months preceding the election;[11] and (4) a significant decrease in

---

[9]At the ALJ hearing, Williamson acknowledged that he may have made such a statement to Johnson. He further stated that his supervisor told him the kill rate was being reduced because of "trouble" in Hattiesburg and he assumed that meant "union trouble."

[10]During the last three weeks of April 1990, the kill rate decreased by approximately twenty-four percent, twenty-one percent, and twelve percent from the kill rate for those same three weeks in April 1989.

[11]The Company had a total of eleven day-long closings at the Hattiesburg plant. In the three months preceding the Union

working hours of Union activists Temple and Cole in March and April in comparison to their hours during those months the previous year.

The NLRB responded to the Company's arguments by observing that the freeze did not appear to affect the Company's plant in Jasper. In addition, the NLRB also concluded that "when we have evidence of an announced intent to discriminatorily reduce production and evidence of such reduced production, we decline to treat even minor reductions in employee working hours as merely "negligible.' "

While the issue is not free from doubt, we ultimately conclude that there is substantial evidence to support the NLRB's decision that the Company violated sections 8(a)(1) and (3) by reducing employees hours. The Company's expressed intent to "starve" the employees, coupled with the management reports showing several day-long plant closings and substantial decreases in the kill rate, are adequate support for the NLRB's conclusion.

IV. Disciplinary Write-Ups and Discharge of Pro-Union Employees

Section 8(a)(3) provides that it is an unfair practice to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in

election, the plant closed on February 21 (a day before the representation hearing), March 7, April 11, and April 18. The Company also had closings after the scheduled election on June 27 (two days after the Union complaint), July 4, November 19, 20, 21, 22, and December 25. Although the Company has not offered an explanation for any of these closings, we observe that six of the closings appear to be associated with national holidays. One closing was on Independence Day, one was on Christmas Day, and four were during the week of Thanksgiving. The other plant closings, however, are not as easily explained.

10

any labor organization."  29 U.S.C. § 158(a)(3).  Section 8(a)(3) proscribes employer reprisals against an employee for engaging in Union activity.  *NLRB v. Delta Gas, Inc.,* 840 F.2d 309, 311 (5th Cir.1988).  Section 8(a)(4) prohibits discrimination against an employee "because he has filed charges or given testimony under this subchapter."  The NLRB found that the Company violated sections 8(a)(1), (3), and (4) by unlawfully retaliating against Walker, Chisholm, Cole, Temple, Powell, and Jones because of their union activities.[12]

A. Walker

Walker, a trimmer who testified on behalf of the Union at the representation hearing, was given a disciplinary write-up on April 6, 1990.  The write-up was for leaving the line and taking a five-minute bathroom break.  Prior to April 1990, Walker had never received a write-up.  The Board credited Walker's testimony that on that date she followed Company procedures by asking another

_____

[12]The Board noted that five of these six employees testified on behalf of the Union at the representation hearing and after the hearing had been labeled "ringleaders" by McDonald.  The sixth employee, Chisholm, actively campaigned and distributed handbills on behalf of the Union.  The violation as to Chisholm was based only on sections 8(a)(1) and (3).  In concluding that the Company unlawfully retaliated against these employees, the NLRB observed that these six active Union supporters received the following "punishments" during the months preceding the scheduled election:  (1) Cole and Temple were given reduced hours;  (2) Walker was given one disciplinary write-up;  (3) Cole was given two disciplinary write-ups between April 1990 and May 1990;  (3) Temple was given three disciplinary write-ups between April 1990 and May 1990;  (4) Chisholm was given a disciplinary write-up and warned he would be fired for hanging around Company property after work;  (5) Jones was given three disciplinary write-ups and then discharged;  and (6) Powell was transferred to more strenuous tasks and subjected to verbal abuse resulting in her leaving the Company due to stress.

employee, Tressie Thomas (Thomas), to find the foreman and ask if she could go to the bathroom. Further, the Board credited Thomas's testimony that she obtained permission from the foreman for Walker to go to the bathroom and then took her place in line.[13] The Board noted that the Company did not have the foreman testify to rebut Walker's and Thomas's testimony. The unrebutted testimony of Thomas and Walker constitutes substantial evidence to support the Board's conclusion that the Company issued Walker a disciplinary write-up in retaliation for her union activities.

B. Chisholm

Chisholm, an employee of the Company from July 1985 to July 1990, was an active Union supporter. For six months prior to his discharge,[14] Chisholm participated in distributing handbills on behalf of the Union and often talked to employees about signing Union cards. Chisholm, who is going blind, stated that over the years of his employment, he often sat in the Company break room or in a relative's car in the Company parking lot waiting for his ride home. Chisholm testified that in May 1990, he was told by Dupre that he could no longer sit in the break room or the parking lot after work. After the warning, Chisholm stated he observed other employees who had finished their shifts sitting in the break room. On May 7, 1990, Chisholm was issued a disciplinary write-up "for staying on Company property after getting off work." In addition,

---

[13]Thomas often replaced workers on the line when they needed to take breaks.

[14]Chisholm did not assert, and the Board did not find, that his discharge was a violation.

12

to Chisholm's testimony, the Board credited Johnson's statement that he was specifically told to run off pro-Union employees Chisholm, Temple, and Cole from the break room after work. The credited testimony of Chisholm and Johnson constitutes substantial evidence to support the Board's conclusion that the Company unlawfully retaliated against Chisholm, contrary to sections 8(a)(3) and (1), by excluding him from the Company premises and giving him a disciplinary write-up.

C. Cole and Temple

On April 12, 1990, Temple, a scaler who had been employed by the Company for twenty-two years, was given a disciplinary write-up. Temple testified that she was handed the write-up by Dupre. Dupre informed her that he had received a complaint about her harassing Bonner and "bad talking employees."[15] Dupre warned her that if she received three write-ups she would "be out the gate."

On April 30, Cole and Temple were both given written warnings by Sanders without their knowledge. The write-up was for placing improper dates on the product labels. Cole testified that she remembered having a conversation with Sanders about the labels. She stated that she told Sanders that she could not be held responsible for the incorrect dates since she was no longer allowed

---

[15]The ALJ noted that Varner had directed Temple's supervisor, Johnson, to give Temple the write-up, but Johnson refused.

to prepare the labels.[16]  Temple stated that on April 30 she met with Sanders, Dupre, and Bonner about the inaccurate labels. Temple testified that she also reminded Sanders that Varner had taken this job duty away from her and reassigned it to Bonner. Sanders testified that he had written up the disciplinary notice before he talked with Cole, Temple, and Bonner.  He stated that after he talked to them, he decided they were right and did not deserve a write-up.  He stated he just put the write-ups in their files as documentation of the incident.[17]

On May 17, Temple and Cole were both given disciplinary write-ups by Sanders for allegedly weighing boxes of chickens with "missing giblets in whole birds."  Again the write-ups were placed in Temple's and Cole's personnel files without their knowledge. Sanders testified that the write-ups were not disciplinary, but rather simply memorializations placed in their files for future reference.

Other testimony at the ALJ hearing established that (1) Cole and Temple were given substantially reduced hours in comparison to other scalers in March 1990;  (2) Cole was threatened by McDonald with discharge due to her Union activities;  (3) Johnson had been

---

[16]During March 1990, Cole and Temple were given reduced hours after the Company officials no longer allowed them to do preparatory work such as scale testing and label preparation. Their former preparatory work duties were reassigned to Bonner.

[17]The ALJ did not credit Sanders' testimony that the write-ups were written before his meetings with Cole and Temple since the write-ups reflect their responses to Sanders' warning. In addition, the ALJ did not believe Sanders' explanation that the write-ups were mere documentation since they were also signed by Dupre.

told by McDonald to find fault with Cole's and Temple's work; and (4) Johnson was told by Dupre to plant Company property on Cole and Temple.

We hold that substantial evidence supports the Board's conclusion that the Company unlawfully retaliated against Cole and Temple by giving them disciplinary write-ups due to their union activities.

D. Powell

In May 1990, Powell, a thirty-year Company employee, was transferred from her relatively nonstrenuous job of making nets and stapling prices to the more arduous job of making boxes.[18] Powell, who is sixty-three, testified that the boxing job required significantly greater effort and involved the lifting and folding of heavy corrugated boxes. Powell's former supervisor Bobby Boutwell (Boutwell) testified he switched employee Dallas Meyers (Meyers) to the net room and Powell to Meyers' place in the box room based on orders from Sanders. Boutwell stated that on a prior occasion he had been instructed by Varner to get Powell out of the net room but he had not complied. Boutwell testified that he resisted both Varner's and Sanders' instructions to remove Powell from the net room because she did good work and he needed her there.

On June 18, Powell was transferred from the box room to the eviscerating line as a heart and liver cutter. This job required

_____

[18]Powell had worked in the net room approximately three or four years prior to her transfer.

15

constant motion, which soon led to shoulder problems for Powell. Powell's injury caused her to miss work between June 26 and July 5. Upon her return, Powell was reassigned to "dirty parts," which caused her pre-existing allergies to flare up. Powell once again left work due to her recurring shoulder pain and her allergic condition.

On July 30, Powell returned to work and was reassigned to the washout station, which involved washing out soiled chickens. During that week, Powell asked Dupre if she could return to her net room job. Dupre replied that there was no longer any net room job. Thereafter, Dupre told Powell he was taking her off workman's compensation and stated he was going to tell the workman's compensation doctor, Dr. Conn, that she had said she could do anything in the plant. Powell then informed Dupre she would not return to work until after she saw Dr. Conn. Powell stated that then she was subjected to verbal abuse from Dupre, who told her that she was senile and should think about retiring.

Powell left work on August 3 and saw a doctor. The doctor recommended that she seek treatment at Pine Belt Mental Health Services for severe anxiety and depression about her job. Thereafter, Dupre learned of Powell's condition from her daughter. On August 21, Dupre wrote Powell a certified letter asking her to contact him within two weeks about returning to work or she would be considered as having quit. On September 4, Powell's attorney responded to the request by informing the Company that Powell was undergoing treatment for work-related anxiety and depression and

16

that she was temporarily disabled.  On September 7, the Company again wrote Powell[19] and told her she should contact them by September 12 or be terminated.  Powell, who was still undergoing treatment, did not reply and was terminated.

After Powell testified at the representation hearing, she was switched to a more strenuous job based on the orders of Varner and Sanders.  Powell's immediate supervisor resisted the efforts of Varner and Sanders to transfer her because he needed her in the net room.  Thereafter, Powell was subjected to more unpleasant tasks, which eventually resulted in her leaving her job of thirty years due to mental anxiety and depression.  Boutwell testified that the net room job still existed.

We hold that substantial evidence supports the Board's finding that Powell was given more strenuous work and constructively forced her out of her job due to her union activities.

E. Jones

Jones, a fourteen-year employee, was discharged in June 1990 for having three disciplinary write-ups.  She had worked as a heart and liver cutter for seven years.  Part of Jones' job as a cutter was to remove the gallbladders of chickens without their bursting. Jones testified that prior to her testimony at the representation hearing she had never been warned about excessive "gall bursting". She testified that after the hearing, however, her supervisor, Bill Helton (Helton), was constantly "riding her for gall" even though her frequency of bursting gall remained unchanged.  Jones also

_____

[19]The Company wrote directly to Powell personally.

testified that an average of ten to fifteen times a day chickens already had gall on them from employees in the line in front of her. Jones stated that she was also warned about cutting and working ahead of her place in line. She testified that cutting line was a common practice for which she had never been reprimanded in the past. Two other employees likewise testified that cutting line was a common practice, one also stating that Jones' replacement "cut line" more than Jones ever did.[20]

On April 10, 1990, Jones was given a reprimand for poor workmanship and bursting too much gall. On June 18, Jones met with Helton, who warned her about bursting gall. Later that day, Jones was called into Dupre's office and told she had three write-ups concerning either bursting gall or cutting line.[21] Dupre then informed her that it was Company policy to terminate employees who had three write-ups within twelve months and discharged her. The Company failed to produce any written memorialization of the rule regarding three write-ups. Evidence at the hearing revealed that, unlike Jones, four other employees had received three disciplinary write-ups within a twelve month period without being discharged.

We hold that substantial evidence supports the NLRB's determination that Jones was unlawfully discharged by the Company in retaliation for her union activities.

---

[20]One employee even testified that Jones's replacement cut line more than Jones ever did.

[21]Jones was given a write-up on June 18 by Helton. Two other cutters testified that Jones had not burst an unusual amount of gall that day.

V. Delay of the Wage Increase

In late 1989 and early 1990, Varner discussed with other members of management the conferral of a general wage increase on the employees at all of its six plants. Varner stated that the Company did not have a schedule of wage increases but had granted raises in March and November 1987 and February 1989. He testified that although the employees of five other plants received the wage increase during February and March 1990, the Company delayed a wage increase for the employees at the Hattiesburg plant based on the advice of outside legal counsel (the law firm of Kullman, Inman, Bee, Downing and Banta).[22] The ALJ specifically credited Varner's testimony that he was advised by counsel "to delay granting of the wage increase pending the election so as to avoid any possibility of [the Company's being accused of] an unfair labor practice or any undue influence of an election."[23] After the employees asked why they were not receiving a raise, the Company posted a notice on the bulletin board with excerpts from a legal publication which stated that unilateral wage increases during an organizing campaign have been held illegal.[24] Although the ALJ credited Johnson's testimony

[22]The Hattiesburg plant did not receive a wage increase until after the Union withdrew its petition for an election.

[23]The Board expressly refused to reverse any of the ALJ's "credibility findings."

[24]The posted bulletin stated:

> "§ 11. Increases in wages and other benefits and promises thereof. [citation omitted] The granting of unilateral wage increases or other increases in benefits during union organizing campaigns is regarded as a prime form of illegal interference with the

19

employees' right to organize.  In the leading pronouncement on this tactic, the U.S. Supreme Court said:

> There could be no more obvious way of interfering with these rights ... than by grants of wage increases upon the understanding that they [the employees] would leave the union in return.  The action of employees with respect to the choice of their bargaining agents may be induced by favors bestowed by the employer as well as by his threats or domination.

*Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678 [64 S.Ct. 830, 88 L.Ed. 1007] 14 LRRM 581 (1944).

> In numerous decisions, unilateral wage increases were found to constitute illegal interference when granted during an organizing campaign with intent to induce the workers to decide against the union.  *NLRB v. Cen-Tennial Cotton Gin Co.,* 193 F.2d 502, 29 LRRM 2288 (CA 5 1952);  *NLRB v. Valley Broadcasting Co.,* 189 F.2d 582, 28 LRRM 2148 (CA 6 1951);  *Stow Mfg. Co.,* 103 NLRB 1280, 31 LRRM 1635 (1953), enforced, 217 F.2d 900, 35 LRRM 2210 (CA 2 1954), cert. denied, 348 U.S. 964 [75 S.Ct. 524, 99 L.Ed. 751], 35 LRRM 2612 (1955); *Wood Mfg. Co.,* 95 NLRB 633, 28 LRRM 1358 (1951); *Lancaster Garment Co.,* 78 NLRB 935, 22 LRRM 1310 (1948) [citation omitted].

> Likewise, the promise of a wage increase "at a crucial point' in an organizing campaign, an increase that in this instance was subsequently put into effect, constitutes illegal interference.  *Coca Cola Bottling Co. v. NLRB,* 195 F.2d 955, 30 LRRM 2046 (CA 8 1952).  Similarly, the promise of an increase if the union is defeated in an NLRB election is unlawful.  *NLRB v. Howell Chevrolet Co.,* 204 F.2d 79, 31 LRRM 2462 (CA 9 1953), affirmed, 346 U.S. 482 [74 S.Ct. 214, 98 L.Ed. 215], 33 LRRM 2225 (1953) [citation omitted]."

The Board does not contest the legal accuracy of these statements.

We also note (without expressing our agreement or disagreement with the Board and Circuit Court decisions discussed) the following from Gorman, *Labor Law* (West 1976), a recognized text:

> "The United States Supreme Court has stated that the

20

actual grant of benefits during an election campaign, given with the intention of inducing employees to reject the union, is unlawful.... *NLRB v. Exchange Parts Co.* [375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435] (U.S.1964)....

....

... The decided cases do indeed tend to invoke the *Exchange Parts* test of "intention of inducing the employees to vote against the union.' But there are several cases where the finding of such an intention is dubious at best and where what is articulated as antiunion animus is in truth a finding that the employer has failed completely to explain to the Board why the benefits were granted or a finding that the asserted employer justification is insubstantial. See *NLRB v. Styletek* [520 F.2d 275] (1st Cir.1975) (prima facie violation is established by showing that benefits were granted while election is pending, and burden shifts to employer to explain; "It is obvious that the closer a wage benefit comes to the day of the election, the harder it will be for the union to answer, and the greater the danger that the benefit will be manipulated to sway the election.'). In substance then, the Board—generally with court approval—does appear to be balancing the discouragement of a vote for the union, stemming from the grant of benefits, against the employer's business reasons for the grant (with the hoped-for defeat of the union not being a substantial business reason). The analysis in the cases is the same regardless whether the employer unconditionally promises that a benefit will be granted or unconditionally grants such a benefit.

....

It is also doubtful that union animus is essential when the employer actually implements an improvement in benefits in the course of an election campaign. Thus, in J.C. Penney Co. v. NLRB (10th Cir.1967), the employer had a practice of granting a wage increase every 12 to 15 months, and granted such an increase 14 months after the previous one but soon after an election petition had been filed by a union. Although the inference that the increase was motivated by a desire to defeat the union—rather than by a desire to perpetuate the past practice—was by no means compelling, the Board and court drew such an inference, and held that the employer could have waited another

21

that in March 1990 Varner told him that he "hoped" that employees gave Union supporters Temple and Cole "hell about the loss of the wage increase," he concluded that, as the wage increase was not scheduled or finalized as to particulars (including amounts and dates) prior to the advent of the election (a finding that the Board did not dispute), the Company's withholding of the wage increase was not a violation of sections 8(a)(1) and (3) of the Act.

The Board reversed the ALJ's conclusion regarding the delayed wage increase. The Board concluded that the Company "violated Section 8(a)(3) and (1) of the Act in February 1990 by delaying the grant of a wage increase to Hattiesburg employees because of their support for the Union." The Board noted that an employer must grant benefits as if a union were not involved. *See Great Atlantic & Pacific Tea Co.,* 166 N.L.R.B. 27, 29 (1967). While the Board acknowledged that there is an exception for employers who delay a wage increase during a union campaign if their pattern of wage

month until the election had been held before granting the increase while remaining within the practice. The Board has in fact found illegal the announcement of a benefit during an election campaign even though the company decision was made before the advent of the union. Hineline's Meat Plant, Inc. (1971). Indeed, it has been held that benefits granted by the employer immediately *after* it prevailed in a representation election may violate section 8(a)(1). Even though the employer's motive could not have been to induce the employees to vote against the union in that election, the likely imminence of the Board's overturning that election and ordering a new one was deemed sufficient to warrant a finding of illegal conduct. See Luxuray of N.Y. v. NLRB [447 F.2d 112] (2d Cir.1971)...." *Id.* at 165-166.

22

increases is haphazard,[25] it noted that to fall within that exception, the employer must not seek "to place the onus for the [delay of the wage increase] on the union."  *Borman's, Inc.,* 296 N.L.R.B. 245, 248 (1989).  In reversing the ALJ, the Board ruled that in two communications with employees, the Company blamed the Union for the denial of the wage increase.  The Board in this respect pointed to Varner's statement to Johnson that he hoped the employees would give Union supporters "hell," and to supervisor Robert Gaines' (Gaines) statement in the presence of four or five employees, responding to a question by one of them as to why they had not gotten a raise and employees at other plants had, that it was "thanks to the union you all didn't get a raise."  The Board held that these statements demonstrated that the Company's actions were a campaign tactic to place the onus for the delayed wage on the Union.

We hold that the Board's decision is not supported by substantial evidence.  Varner's causal comment was made only in the presence of another management level employee who was not a part of the Union campaign.  Thus, Varner's private remark that he hoped Union supporters "caught hell" is not evidence that the Company blamed the Union in its communications with *unionizing* employees (there is no evidence Johnson ever said anything of this kind to employees).  Further, Varner's comment was made in March, while the challenged decision had been made the previous month.  Gaines'

---

[25]Neither the Board nor the ALJ found that the Company's pattern of wage increases was not haphazard.

23

comment was made in late April or early May 1990, also *after* the Company's decision to delay the wage increase. Nor is there any evidence Gaines' remark was made before the election was cancelled.[26] Gaines was a mid-level plant supervisor who was not shown to have any authority or influence with respect to the wage decision or knowledge (apart from the posted notice) of why it was taken. We conclude that the Board's decision that the Company's delayed wage increase was unlawfully motivated is contradicted by the unrebutted evidence establishing that (1) the Company wage increases were not regularly scheduled; (2) Varner was advised by outside legal counsel not to grant the wage increase to Hattiesburg employees in order to avoid the risk of unfair labor practice charges; and (3) the posted bulletin reflected, and informed employees, that the Company's reason for the wage delay was to avoid illegal interference with the Union campaign.[27] The statements by Varner and Gaines well after the decision was taken do not, considering the record as a whole, constitute substantial evidence that it was unlawfully motivated. One comment was made in private to another supervisor and the other comment was an isolated, passing remark of a mid-level supervisor made, in

---

[26]The only evidence is it was made "around late April of 1990 or early May 1990"; the election was cancelled May 3, 1990.

[27]Under the Board's decision, employers would be caught between the proverbial "rock and a hard place." On the one hand, if they grant an unscheduled wage increase, they will be accused of trying to unfairly influence the employees. On the other hand, if the Company delays the wage increase in its plant where employees are organizing, the Board will allege they delayed the increase to influence the employees.

24

response to an employee question and in the presence of only four or five employees. Nor is either remark inconsistent with the Company's having made the decision on the basis of counsel's advice.

We set aside this part of the Board's decision.

## Conclusion

The Board's decision is set aside insofar as it finds that the Company violated sections 8(a)(1) and (3) by delaying the wage increase. In all other respects, the Board's decision is affirmed and ordered enforced. The matter is remanded to the Board for an appropriate order consistent herewith.

AFFIRMED in part; REVERSED in part; REMANDED.