NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GENERAL INDICATOR CORPORA-
TION, REDCO DIVISION,
Respondent.

No. 82–1861.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1983.
Decided May 10, 1983.

James Donathan, NLRB, Washington, D.C., for petitioner.

Stuart I. Cohen, Davis & Morgan, Peoria, Ill., for respondent.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and ASPEN, District Judge.*

COFFEY, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order directing the respondent, the Redco Division of the General Indicator Corporation, to reinstate a discharged employee. Enforcement denied.

## I.

This dispute arises out of the Company's discharge of one of its employees, Bobby Rhines, for disrupting the productivity schedule of other employees during working hours. Rhines was hired by the Company in 1965 and rose to the level of "lead man" [1] in a division of the Company's Wiring Department. In 1976 Rhines was removed from this position as a lead man after fellow employees complained that Rhines was arguing with them over work assignments. However, after this disciplinary transfer when Rhines was no longer in a supervisory capacity, he continued his pattern of disruption in the Wiring Department by continuing to argue with his fellow workers about work assignments and ordering other employees in the department to do certain jobs although he was without such authority. Furthermore, Rhines kept the Wiring Department in turmoil by repeatedly complaining about wanting to replace Ken

1. According to company policy, an employee designated as "lead man" on a job is the employee who establishes the wiring pattern to be followed by his co-employees on that job.

Johnson, the union steward.[2] As a result of Rhines' pattern of dissension and disruptive conduct, Rhines was warned to stop interfering with the work of the Company's other employees or his employment would be terminated. The events leading to Rhines' discharge culminated on April 3, 1980 when at about 11:15 a.m. Rhines approached two employees of General Indicator while these employees were working at their station in the Sheet Metal Department and informed them that he (Rhines) wished to talk with them about union steward Johnson and asked them to step away from their work station. Both employees refused, stating that they wished to continue at their work assignment, but Rhines insisted they stop work. The employees repeatedly told Rhines to leave, and after some five minutes they suggested that if Rhines wished to talk to them, they could meet during the lunch break. At this point, Rhines relented and the men returned to their work.

During the lunch break, one of the employees Rhines had previously interrupted at work approached Johnson and told him that Rhines had tried to enlist his support in replacing Johnson as shop steward and had interfered with his work schedule. Later, that same employee approached Stan Jolliff, the Company's foreman, and repeated his complaint that Rhines had kept him from accomplishing his assignment during working hours by talking to him (for five minutes) during working time. That afternoon, Jolliff and Johnson informed Dave Fulton, the Company's president, of Rhines' disruptive behavior that day and that prior to the incident in question Rhines had received a number of warnings regarding his inability to get along with other employees. Jolliff recommended to Fulton that Rhines be discharged as his erratic conduct was keeping the shop in constant turmoil. Fulton agreed with Jolliff's recommendation and had a letter drafted for Jolliff's signature authorizing Rhines' termination. On April 4, 1980 Jolliff informed

Rhines that his services were no longer necessary and presented him with the following letter of termination:

"I am sure you are aware of the concern for the unsettling relations with other employees resulting from your actions on numerous occasions. Your supervisor and representatives of the Union have brought these matters to your attention in the form of warnings, without result. Since the unsettling effect has recently become very serious, it is my responsibility to inform you that your employment is being discontinued effective immediately."

Some five months after his discharge Rhines filed an unfair labor practice charge alleging an unlawful discharge in violation of the National Labor Relations Act, 29 U.S.C. § 151 et seq. Thereafter, the Regional Director of the NLRB issued a complaint based on Rhines' charge that the Company had violated the National Labor Relations Act (specifically 29 U.S.C. § 158) in discharging Rhines while he was engaged in protected activity. The General Counsel for the National Labor Relations Board also charged that the Company terminated Rhines to discourage other employees from engaging in concerted activities. The Company filed its answer denying it had violated the National Labor Relations Act, and a hearing was held before an Administrative Law Judge.

The Administrative Law Judge agreed with the NLRB and reasoned that Rhines was engaged in protected activity when he disrupted the productivity of his fellow workers because "[t]o seek changes, as here, in the union representation of employees in the bargaining unit is a right protected by the Act . . . ." The ALJ further concluded that the Company's justification for discharging Rhines, i.e. that he had a long history of creating dissension among the other employees, was nothing more than a "mere pretext to conceal the real discriminatory reason for discharging Rhines." The

---

**2.** Rhines was concerned about the fact that union steward Johnson was the nephew of foreman Jolliff; however, there was no evidence presented at the hearing to show whether the Company had any interest in having Johnson keep his position as union steward.

ALJ held that the real reason for discharging Rhines was the fact that Rhines opposed shop steward Johnson. The ALJ therefore found the Company in violation of the National Labor Relations Act in "discriminatorily discharging Rhines ... for engaging in union activities" and ordered the Company to reinstate Rhines with backpay to his former job or one substantially equivalent. A National Labor Relations Board panel affirmed the conclusions and findings of the Administrative Law Judge and adopted his order. The Company took exception to the Board's order and refused to comply with their directive. The National Labor Relations Board filed this petition for enforcement.

## II.

■ Under 29 U.S.C. § 158 it is an unfair labor practice for an employer to "interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title;" section 157 in turn grants employees

"the right to self-organization, to form, join or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...."

However, it has long been held by the courts and by the NLRB that employees may not engage in concerted activities which might otherwise be protected "without regard to the employer's undisputed right to maintain discipline in its establishment." *J.P. Stevens and Company v. NLRB,* 547 F.2d 792, 794 (4th Cir.1976). *See also Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

"The discharge of an employee for wrongful conduct is an inherent power of management and one that is protected by law.... So long as the action is not based upon opposition to union activities ... 'If an employee is both inefficient [insubordinate] and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge.'" (Brackets in original). (citations omitted).

*Boaz Spinning Co. v. NLRB,* 395 F.2d 512, 516 (5th Cir.1968). "The burden ... is on the Board to show affirmatively by substantial evidence that [an employee's] discharge was discriminatory and motivated by ... alleged union activities," before an employer can be found guilty of violating the National Labor Relations Act for discriminatorily discharging an employee based upon alleged union activities. *Portable Electric Tools, Inc. v. NLRB,* 309 F.2d 423, 426–27 (7th Cir.1962).

"Where, as here, an employee's pro-union activity is asserted to have interfered with management's right to maintain order and respect ... the Board must engage in what we have described as a 'balancing process.' The employees' rights are to be weighed against the interests of management in the pursuit of its lawful objectives. This balancing process, resting initially with the Board, is not immune from judicial review."

*NLRB v. Prescott Industrial Products Co.,* 500 F.2d 6, 10 (8th Cir.1974) (footnote omitted).

■ Before the Company can be found to have violated the National Labor Relations Act in discharging Rhines, the NLRB must establish that Rhines was discharged while engaging in protected conduct. It is clear from our review of the record that the NLRB has failed to establish that Rhines was engaged in protected activity or that the allegedly protected activity was a motivating factor in his discharge. In contrast to the NLRB's decision in the instant case, case law holds that an employee who disrupts other employees during working hours is not engaged in a protected activity even though he is discussing union business. *See NLRB v. Prescott Industrial Products Co.,* 500 F.2d 6 (8th Cir.1974) (An employee's discharge was upheld where the employee disrupted the employer's lawful anti-union speech and where the employee became abusive and insubordinate when instructed by the employer to sit down); *Caterpillar Tractor Co. v. NLRB,* 230 F.2d 357 (7th Cir.1956) (The National Labor Rela-

tions Act does not protect activities "which inherently carry with them a tendency toward, or a likelihood of disturbing efficient operation of the employer's business"); and *Stuart F. Cooper Co.,* 49 LRRM 1729 (1962) (The employer did not violate the Act by discharging pro union employees whose bickering and dissension interfered with production). *See also Boaz Spinning Co. v. NLRB,* 395 F.2d 512 (5th Cir.1968). We hold that General Indicator's substantial interest in maintaining productivity and a semblance of order in the work place greatly outweighs Rhines' unprotected interest in disrupting the Company's production schedule. Rhines had no right to interfere with the work schedule of his co-workers and should have waited fifteen minutes and then approached the employees during their break period. Had Rhines waited the fifteen minutes until the scheduled break period, he would not have come into conflict with the Company's interest in maintaining order and productivity and the instant dispute would have been avoided. *See NLRB v. May Department Stores Co.,* 154 F.2d 533, 536 (8th Cir.1946); *see also Peyton Packing Co.,* 49 NLRB 828 (1943). Therefore, after balancing Rhines' interest as an employee and his wrongful conduct against the Company's undisputed interests, we hold that an employee who attempts to engage other employees in discussions about the replacement of a union steward during working hours at their station and disrupts the production or work program of the other employees is not engaged in that type of union activity protected by the National Labor Relations Act. Thus, an employer is justified in discharging an employee who engages in this type of disruptive activity as the employer's interest in maintaining order and productivity in the work place outweighs that of the employee.

■ The Board argues in its brief that the Company violated the National Labor Relations Act by discharging Rhines for violating an alleged Company rule prohibiting employees from talking to one another and interrupting production because the Company had in the past failed to uniformly enforce this rule. However, the National Labor Relations Board's argument ignores the fact that Rhines was not discharged solely because he engaged in discussions with other employees, or even due to the content of the conversation he had with the other employees. Rather, Rhines was discharged because he had a history of disrupting the work schedule of co-employees, and even after he had been disciplined for this pattern of disruption and had received a "final warning," he continued to approach other employees and prevent them from completing their assigned tasks in a timely manner. It is also significant to note that the employees themselves repeatedly asked Rhines to leave their work area and to stop the interruption of their productivity.[3] The NLRB thus ignores the overwhelming evidence that the Company authorities discharged Rhines for a continual pattern of disruptive and insubordinate behavior and activities as well as for interfering with productivity, and not because he solicited other employees for union related matters. We hold that when an employee leaves his work station and disrupts the work of other employees during their work time, it is well within the rights of an employer to terminate that disruptive employee regardless of whether or not the employer has a rule prohibiting "solicitation" at the time of the disruption as an employer has the inherent power to discharge employees for "wrongful conduct."

### III.

■ Assuming only for the sake of argument that Rhines was engaged in protected activity when he interrupted the work of the other two employees to discuss replacing the union steward, we now address the question of whether there was substantial evidence in the record to support the National Labor Relations Board's finding that the Company's justification for discharging Rhines was a "pretext." During the hearing before the Administrative Law Judge, the General Counsel for the NLRB present-

---

**3.** The record does not disclose whether these employees were paid on a piece-work basis.

ed Rhines' testimony that the Company discharged him (Rhines) due to the *content* of his conversation with the other two shop employees. It was the NLRB's General Counsel's position that the only reason the Company discharged Rhines was because he wished to replace the current shop steward, as that steward was the nephew of one of the Company's foremen. The Company, on the other hand, presented evidence demonstrating that Rhines was a constant source of turmoil among the other employees and had a history of disruptive conduct throughout the entire tenure of his employment with the Company. Testimony revealed that even after his removal from "lead man" status Rhines continued to interfere with the production schedule of the other employees and in order to maintain industrial peace the Company was forced to reassign Rhines to work in another area of the plant.

After his reassignment Rhines continued to complain to other employees that he wanted to replace Johnson as union steward, a fact known throughout the plant. Moreover, in his new assignment Rhines refused to follow Johnson's "lead" on the assigned tasks as required by the Company's "lead man" policy, a policy developed to ensure that each assignment was wired correctly. After Johnson complained to foreman Jolliff, Jolliff warned Rhines that he was to take his directions from the "lead man," Johnson. However, less than two weeks thereafter Rhines again refused to accept a wiring assignment from Johnson and began swearing at Johnson when he (Johnson) directed him (Rhines) to resume his assigned task. This time Jolliff took both Johnson and Rhines to Eller, the production manager, to attempt to have Eller settle the dispute. After discussing the problem with the three men, Eller determined that Rhines was not wiring the assigned task according to Johnson's direction as was required by the Company's "lead man" policy. Jolliff at this time suggested firing Rhines but Eller refused and reassigned him to work on his own, independent and away from any other employees, with the warning that this was Rhines' last chance.

A short ten days thereafter, the incident which finally led to Rhines' discharge took place. As noted in part II, *infra*, Rhines left his own work station and approached two other employees and interrupted their work schedule. After being informed of Rhines' past and present disruptive behavior, Dave Fulton, the Company's president, agreed that Rhines should be discharged and had the termination letter drafted. Notwithstanding the fact that Rhines had a history of disruptive behavior during working hours and that the termination letter expressly referred to Rhines' "unsettling relations with the other employees" as the reason for his discharge, the ALJ rejected this overwhelming evidence and accepted Rhines' argument that he was discharged for engaging in protected activity.

In a recent Seventh Circuit decision, this court set forth the burden of proof in cases involving the alleged discriminatory discharge of an employee for engaging in purportedly protected activities. In *NLRB v. Webb Ford, Inc.,* 689 F.2d 733, 739 (7th Cir.1982), the court stated:

> "Under the proper test, the ALJ must determine first whether the General Counsel has established a prima facie case of discriminatory discharge. Then the employer must advance some legitimate non-discriminatory reason for its action in order to satisfy its burden of going forward. The General Counsel then has the obligation to prove by a preponderance of the evidence that those proffered reasons were not the company's true reasons for the discharge."

The testimony at the hearing clearly established that Rhines had a history of disrupting the work assignments of his co-employees and causing dissension and turmoil within the Company's plant. Furthermore, the Company bent over backwards to accommodate Rhines by giving him assignments where he would work separately and independently of the other employees and thus enable him to avoid possible conflicts. At the time Rhines was separated from the

rest of the work force, he was warned that this was his last chance and that if he continued his pattern of disruption in the work place he would be fired. In warning Rhines and requiring him to work by himself the Company was attempting to make one final effort to balance Rhines' interest in keeping his job with the Company's interest in maintaining some semblance of industrial peace and tranquillity among the work force. When Rhines disregarded the Company's interests and approached the other employees during their work hours and disrupted their work activity, and taking into consideration Rhines' previous pattern of insubordinate behavior, the Company was clearly justified in discharging him.

The ALJ based his decision on the NLRB's argument that Rhines was discharged because of the content of his conversation with the other two company employees. This finding by the ALJ ignores the undisputed evidence that Rhines had actively opposed Johnson as union steward for a number of years and that his opposition to Johnson had been common knowledge throughout the plant. Because company officials were allegedly aware of Rhines' opposition to Johnson for some time, if the Company had wanted to discharge Rhines because he wished to replace Johnson, the Company could and would have acted at an earlier date. Moreover, Fulton testified at the hearing that contrary to the allegations of the NLRB, he was unaware of the content of the conversation between Rhines and his fellow employees concerning replacing Johnson as union steward, and further related that "we were only concerned with the fact that the employee was away from his work area contrary to instructions and was disrupting the efforts of others to perform their job.... There were no words mentioned about what Mr. Rhines' comments were." In light of the overwhelming evidence, we hold that Rhines was discharged because of his disruptive behavior and he was not engaged in protected activity, and therefore we hold that the National Labor Relations Board and the Administrative Law Judge erred in finding the Company guilty of committing an unfair labor practice in discharging Rhines. The facts more clearly demonstrate that the Company had bent over backwards and went beyond any legal obligation to protect Rhines' interest in his employment and accommodate his disruptive personality and thus "advanced [a] legitimate non-discriminatory reason" for Rhines' discharge that stands unrebutted in the record by the General Counsel for the NLRB. Enforcement of the National Labor Relations Board's order is DENIED.