**FRAZIER INDUSTRIAL COMPANY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 99–1297.

United States Court of Appeals, District of Columbia Circuit.

Argued April 11, 2000.

Decided June 9, 2000.

Robert Leinwand argued the cause for petitioner. With him on the briefs were Michael Hoffman and Robert G. Hulteng.

Anne Marie Lofaso, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David S. Habenstreit, Supervisory Attorney.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge KAREN LeKRAFT HENDERSON.

ROGERS, Circuit Judge:

Frazier Industrial Company appeals the National Labor Relations Board's decision that the company violated § 8(a)(1) and (3) of the National Labor Relations Act. See 29 U.S.C. § 158(a)(1), (3) (1994). The company contends that the Board's conclusion that it violated § 8(a)(1) and (3) by discharging John Ramirez for engaging in union activity was unsupported by substantial evidence, and that his reinstatement with backpay was an abuse of discretion and inconsistent with the after-acquired evidence rule. We deny the petition and remand the case for enforcement of the Board's order.

## I.

Frazier Industrial Company manufactures steel storage systems for warehouses. The company has manufacturing facilities at locations throughout the United States, and the instant case involves its plant in Pocatello, Idaho, which began op-

erating in March 1996. During the plant's startup phase, Dennis Haga, the plant manager, hired nine welders and nine other employees to perform fabrication, maintenance, painting, and other duties.

One of the welders, John Ramirez, applied for the position at the request of the International Association of Sheet Metal Workers Association, Local 60 ("the union").[1] Ramirez, a member of the union, was asked to assist in organizing the company's work force. Ramirez started working for the company on March 7, 1996. Beginning in April, he solicited employees to attend organizational meetings and to sign union authorization cards. According to Ramirez, he spoke with more than half of the plant's work force about the union, and spoke with at least one person about unionization daily or every other day before his discharge. We review his activities in light of the company's contention that Ramirez was harassing employees and, thus, his activities were not protected by the Act, and that even if Ramirez's conduct were protected, the company would have terminated Ramirez even in the absence of protected conduct.

In late May 1996, Ramirez approached Mike Jennings, another welder, and asked him to sign an authorization card while on break. Jennings did not sign the card but told Ramirez that he would take the card home and discuss it with his wife. Ramirez followed up with Jennings several times during May 1996. Jennings never brought the card back to Ramirez, nor did he tell Ramirez that he was uninterested in joining a union. Jennings did speak with Clint Moosman, a supervisor, and asked him whether he "was aware of what was going on" in regard to Ramirez's attempts to interest Jennings in the union. Moosman told Jennings that "Ramirez could solicit ... before work, during breaks, and after work, but not on company time." At around the same time, an employee remarked to a group of other employees in the plant lunchroom during a break that they should start a union. Moosman overheard the remark, and angrily told the employees, "Well if I hear of anyone going union ... they'll be down the road."

Marty Hrabik, another supervisor, received two complaints from employees about Ramirez's union activities in May and June of 1996. Hrabik and Moosman met with Haga, the plant manager, in early June 1996. Haga told them to warn their employees "that they could do whatever they wanted to on their own time, but on company time they need not [ ] talk about the union or bother[ ] anybody about it." Following that meeting, Moosman spoke with the welders at their work stations and explained that there had been complaints about some employees "harassing" others to join a union. Moosman warned each welder, including Ramirez, that what they did on their own time was their business, but that they could not "harass" employees about the union during "company time."[2] Moosman then delivered the same message to a group of employees, also including Ramirez, in the

1. Previous to his employment at the Frazier Industrial Company, he was an employee of G&L Metal but was discharged for absenteeism and for attempting to organize workers. When he applied for employment at the company, Ramirez failed to disclose this information.

2. The company distributed an employee handbook on its policies and rules at other locations, but did not give Pocatello employees the handbook until July 1996, subsequent to the events underlying Ramirez's discharge. The handbook stated the company's no harassment policy as follows: "[h]arassment of an employee ... is unacceptable and will not be tolerated" and "[m]anagers and supervisors are responsible for promoting and maintaining a working environment which is free of such harassment for all employees." The handbook further stated that "[i]n the event such harassment does occur, managers and supervisors must take immediate corrective action, including, where appropriate, dismissal of the offender." Before the handbook was distributed, company supervisors orally informed the Pocatello employees of the company's policies on an ad hoc basis, and the plant culture was one in which employees engaged in diverse personal conversations during working time, with the knowledge of management.

lunchroom during a break. During the meeting, Moosman told the employees that "he wanted to know about it if some one was talking to [them] about the union on company time."

In early June 1996, the union sponsored several meetings. The day after one meeting, Moosman remarked to Robert Rodriguez, an employee who had attended the meeting, that he had heard a rumor about a "little bitch session" where employees talked about "stuff" that they did not like about the shop. Moosman told Rodriguez that he "was disappointed" in him. Rodriguez told Moosman that he and others had discussed whether or not they wanted to continue working at the shop with Haga, Hrabik, and Moosman being "the way they were." Following that remark, Moosman took out his knife, opened it, handed it to Rodriguez handle first and said, "[W]ell don't cut your own throat." Later that day, Moosman asked Rodriguez for the names of the employees who were at the union meeting. When Rodriguez did not disclose the names other than his own, Moosman told him, "If you continue to cut your own throat I'm not going to be able to do anything for you."

Hrabik discussed the union with some employees as well. Employee Allen Wilcox had promised Hrabik that he would come to Hrabik's house one evening to help build a fence, but Wilcox missed his appointment for personal reasons and to attend a union meeting. The next day, Hrabik asked Wilcox how the meeting was. When Wilcox asked if Hrabik referred to his personal meeting, Hrabik replied, "[N]o you know what meeting." Hrabik had another discussion about unionizing when Wilcox was at his house with Rodriguez to work on the fence as he had promised. While working, Hrabik was asked what he thought about the union organizing, and Hrabik told them that the company did not "have any stock here in Pocatello" and that "Frazier isn't going to allow this, the union to spread to the other com-

panies, they'll just close this plant up and they'll move on." Hrabik added that if his job were threatened he would "start cutting throats," and that if he were fired, they were "going down" with him. Shortly afterwards, Hrabik asked Wilcox why certain employees wanted a union, and upon hearing that perhaps employees wanted better pay or better benefits, Hrabik said that before the company "went union they would either hire non-union or shut the plant down."

Also in June 1996, employees Todd Chandler and James Frasure complained to Hrabik that Ramirez was "harassing" them about attending union meetings. Ramirez spoke to Chandler five or six times over several days about an upcoming union meeting, and Chandler neither expressed an interest in attending a union nor told Ramirez that he was not interested. Similarly, Frasure was approached several times by Ramirez, including four or five approaches on company time on one particular day, each time to urge Frasure to attend a union meeting. Ramirez's remarks to Frasure were brief and on each occasion Frasure said that he would think about it, never telling Ramirez that he was uninterested. However, when Frasure talked to Hrabik about Ramirez, he said that Ramirez's persistence about the union meetings was "really pissing [him] off." Hrabik told Moosman about these conversations, and both met with Haga, who said that "harassing" employees on company time "had to stop." Later that day, Moosman told the employees, including Ramirez, that "there had been complaints about people being harassed on company time that needed to stop."

Around the same time, Ramirez followed up on his earlier discussions with Jennings about unionizing and invited him to meet with a union organizer. Jennings responded that he would think about it. Later that day, Ramirez talked to Jennings, who at the time was working with employee Tom Neilsen.[3] Ramirez testified that this

---

**3.** This meeting took place after Ramirez had already approached Neilsen on a previous

occasion. Ramirez asked him at their initial meeting for his opinions on unionizing, and

conversation lasted about twenty minutes, while Jennings stated that they spoke for about forty-five minutes. Several days later, Ramirez, after the end of his workday, saw Jennings reporting for work and spoke with Jennings for about ninety seconds in an effort to persuade Jennings to meet with a union organizer. Jennings agreed to make an appointment, and then Ramirez, noticing that Haga was watching them, ended the conversation. After Ramirez left, Haga asked Jennings if Ramirez was bothering him, and Jennings replied that "[Ramirez] was bothering [him] about the damn union stuff and won't leave [him] alone." Later that day, Haga asked Moosman to tell Ramirez to report to Haga's office the next morning.

When Ramirez met with Haga in his office the next day, Haga asked Ramirez, "[W]hat am I going to do with you, John?" Haga told him that people were complaining about him "bothering them all the time" and that it was "affecting ... productivity." Ramirez denied that he was bothering anyone. When Haga repeated, "[W]hat am I going to do with you," Ramirez replied, "[W]ell you're the plant manager you do whatever you have to do." Haga, who testified that Ramirez had "a really bad attitude about it," offered him the opportunity to quit, but Ramirez refused and Haga discharged him. Later that morning, Hrabik spoke to Rodriguez about Ramirez's discharge and told him that Rodriguez should now understand why he should not talk about the union on company time.

Following his discharge Ramirez applied for unemployment insurance, and stated on the application that although he was discharged for organizing on company time, he never did organize on company time. The Idaho Department of Labor denied his application.

Based on the foregoing evidence, the Board adopted the Administrative Law Judge's findings that the company violated § 8(a)(1) by threatening to discharge employees who engage in union activities, coercively interrogating employees about their union activities and sympathies,[4] threatening employees that it would close the plant if employees chose union representation, and maintaining and enforcing a rule prohibiting union talk while permitting other nonwork discussions. *See Frazier Indus. Co.*, 328 N.L.R.B. No. 89, at 3, 14–15 (June 14, 1999). The Board, by a two to one vote, also adopted the judge's findings that the company violated § 8(a)(1) and (a)(3) by discharging Ramirez because of his union activity. *See id.* at 3, 15. The Board ordered the company to cease and desist from engaging in these unfair labor practices and ordered the company to offer Ramirez full reinstatement and backpay for any lost earnings and benefits. *See id.*

## II.

 Section 8(a)(1) and (3) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise of the rights guaranteed" by the Act, 29 U.S.C. § 158(a)(1), and "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3). To establish a causal nexus between adverse employment decisions and an employee's union affiliation, the complaining party must first show that protected activity "was a 'motivating factor'" in the ad-

---

Neilsen responded then that he "wasn't really for the union."

4. Although the Board unanimously found that the company unlawfully interrogated employees about their union activities on various occasions, the finding that Haga's inquiry of Jennings as to whether Ramirez was bother-

ing him the day before Ramirez was discharged constituted an unlawful interrogation was made by a two to one vote. The dissenting member thought that Haga's questioning was "lawful in view of the repeated complaints by employees, including Jennings, of harassment by Ramirez." *Frazier*, 328 N.L.R.B. No. 89, at 6 n. 12.

verse employment decision, and then the employer may show that it would have made the adverse decision even had the employee not engaged in protected activity. *Wright Line, Inc.,* 251 N.L.R.B. 1083, 1089 (1980); *see also NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving of the *Wright Line* approach). To establish an employer's discriminatory motive, the Board may "consider[ ] such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action." *Power, Inc. v. NLRB,* 40 F.3d 409, 418 (D.C.Cir.1994). In addition, evidence that an employer has violated § 8(a)(1) of the Act can support an inference of anti-union animus. *See Parsippany Hotel Management Co. v. NLRB,* 99 F.3d 413, 423–24 (D.C.Cir.1996).

 The court will affirm the findings of the Board unless they are "unsupported by substantial evidence in the record considered as a whole," *General Elec. Co. v. NLRB,* 117 F.3d 627, 630 (D.C.Cir.1997), or unless the Board "acted arbitrarily or otherwise erred in applying established law to the facts." *Allegheny Ludlum Corp. v. NLRB,* 104 F.3d 1354, 1358 (D.C.Cir.1997) (quotation and citation omitted). Even if the court might have reached a different conclusion had the court considered the issue *de novo,* the court will uphold the Board's decision if it is supported by substantial evidence in the record. *See Synergy Gas Corp. v. NLRB,* 19 F.3d 649, 651 (D.C.Cir.1994). The court gives even greater deference to the Board's determination of questions of motive, *see Laro Maintenance Corp. v. NLRB,* 56 F.3d 224, 229 (D.C.Cir.1995), and "accept[s] the ALJ's credibility determinations that are adopted by the Board 'unless they are patently unsupportable.' " *Schaeff Inc. v. NLRB,* 113 F.3d 264, 266 (D.C.Cir.1997) (quoting *NLRB v. Creative Food Design Ltd.,* 852 F.2d 1295, 1297 (D.C.Cir.1988)); *see also Capital Cleaning Contractors, Inc. v. NLRB,* 147 F.3d 999, 1004 (D.C.Cir.1998).

The company contends that Ramirez "harassed" co-workers regarding the union during working time, and on the company premises, and that such solicitations were not protected by the Act. The company maintains further that, even if Ramirez's actions constituted protected activities, its termination of Ramirez's employment was lawful because it would have discharged him in the absence of protected conduct for his insubordination and dishonesty. We hold that there is substantial evidence in the record to support the Board's conclusions that Ramirez's conduct was protected union activity under the Act, that the company violated the Act by discharging Ramirez for engaging in such protected union activity, and that the company's other proffered reasons for termination of Ramirez's employment—insubordination and dishonesty—are insufficient to meet its burden under *Wright Line.*

 In support of its contention that Ramirez's conduct was not protected by the Act because he was engaged in repeated harassment of fellow employees during work time resulting in frequent interruptions of work, the company relies on *NLRB v. General Indicator Corp.,* 707 F.2d 279 (7th Cir.1983), which held that "an employee who disrupts other employees during working hours is not engaged in a protected activity even though he is discussing union business." *Id.* at 282. Similarly, Board precedent states that "activity that would otherwise be protected may lose that protection if the means by which that activity is conducted are sufficiently abusive or threatening." *Patrick Indus., Inc.,* 318 N.L.R.B. 245, 248 (1995). Under such precedent, the company contends, the fact that Ramirez was attempting to organize the company's work force is immaterial because he had no legitimate protected interest in repeatedly approaching and harassing his co-workers while they were trying to work. Although this interpretation of evidence may be reasonable, the Board's finding to the contrary

was supported by substantial evidence in the record.

The Board found that Ramirez's activities were protected because "it is clear that ... all of Ramirez' worktime solicitations were brief and did not involve any obvious disruption in production." *Frazier*, 328 N.L.R.B. No. 89, at 2. Adding that "there is no evidence that employees whom Ramirez solicited more than once ever even told him that he was interfering with their work or that further solicitations would have that effect," *id.*, the Board found that although Ramirez tenaciously solicited employees to sign cards, attend the union's meetings, or meet individually with a union organizer, he did not pursue such matters with employees over their expressed objections. On the contrary, the Board found that "his persistence, in the main, resulted in those instances where he received tepid or inconclusive responses from the employees with whom he spoke." *Id.* at 13.[5] The Board thus concluded that Ramirez's conduct, while persistent, did not rise "to the level of unprotected harassment." *Id.* at 2. There is substantial evidence in the record to support the Board's findings.

Ramirez followed up with Jennings about signing an authorization card only after Jennings stated that he would take the card home, think about it, and discuss it with his wife.[6] Ramirez similarly followed up with employees Chandler and Frasure only after they had given Ramirez the impression that they were at least feeling ambivalent about unionizing. By contrast, Ramirez never spoke to Neilsen about the union again after Neilsen informed Ramirez in their initial conversation he "wasn't really for the union." Neilsen was present as a bystander to a conversation Ramirez had with Jennings one evening, and this conversation was the only conversation that was more than momentary, lasting twenty minutes according to Ramirez and forty-five minutes according to Jennings. However, as the Board explained, there is "no evidence that anyone told the [company] about this incident before Ramirez's discharge." *Id.* at 2 n. 5. Therefore, how long this particular conversation lasted and what Jennings told Ramirez in the conversation are immaterial. In addition, there is no evidence that Ramirez's solicitations were other than courteous or produced disruptive arguments.[7]

 Taking another tack, the company contends that the Board's finding that Ramirez's activities were protected was based on erroneous legal standards, requiring the company to demonstrate Ramirez's interruptions were lengthy and resulted in a loss of production and requiring Ramirez's

---

5. The Board also rejected the company's contention that, although no employees had directly asked Ramirez not to approach them in the future, its warnings that employees were not to "harass" coworkers about the union on working time put Ramirez on notice that future entreaties to the complaining employees about the union would be considered harassment. *See Frazier*, 328 N.L.R.B. No. 89, at 13–14. The Board's conclusion was reasonable; those warnings, themselves unlawful, did not identify for Ramirez the employees who did not wish to be solicited, nor did they provide any guidance as to what constituted harassment, other than that union organizing on company time was unwelcome.

6. The company claims that Jennings repeatedly told Ramirez that he was not interested, and Jennings testified to that effect; however, the Administrative Law Judge did not credit this assertion. *See id.* at 13.

7. The company maintains that Ramirez's solicitations were disruptive and cites the instance in which employee Clair Monson started screaming at him when Ramirez approached him. (Presumably, our dissenting colleague's description, "almost to the point of a physical fight," refers to this incident.) However, the Board has ruled that mere hostile reactions to protected union solicitation do not render that conduct unprotected. In *Patrick Industries*, the Board stated that "the test for determining whether a given union card solicitation was protected is not the perhaps idiosyncratic reaction of the particular employee who happened to be on the receiving end of that activity," and that "it is for the Board to decide whether or not the Act's protections apply." *Patrick Indus.*, 318 N.L.R.B. at 248.

co-workers to confront Ramirez directly instead of complaining to supervisors. This contention mischaracterizes the Board's findings. The Board did not apply a general standard that work time interruptions must be lengthy and result in a loss of production in order for them to be harassment. The question that the Board was addressing was whether Ramirez's activities rose to the level of harassment, and, in order to make that determination, the Board considered various factors, such as how long each interruption lasted, how disruptive it was, how courteous or abusive Ramirez was in each instance, and whether he respected co-workers' requests not to be bothered. The Board noted that Ramirez's conduct was neither lengthy nor disruptive only because they were, quite reasonably, considered to be relevant to the Board's determination that his conduct was protected by the Act, and not because it determined that only lengthy interruptions rose to the level of harassment.

Contrary to the company's contention, this approach is consistent with *Patrick Industries* and *General Indicator.* In *Patrick Industries,* the Board ruled that an employee's repeated solicitations of a coworker to sign an authorization card were protected under the Act, and explained that in the absence of evidence that the employee ever "threatened or abused" the coworker or even "raised his voice," a conclusion that the activity was unprotected could "significantly limit the ability and willingness of employees to solicit their fellow employees' support for, opposition to, a union, activity that is central to the purposes of the Act." *Patrick Indus.,* 318 N.L.R.B. at 248. Also, unlike the instant case, in *General Indicator,* where the Seventh Circuit held that an employer lawfully discharged an employee who engaged in union activities on company time, the discharged employee "had a history of disrupting the work schedule of co-employees, and even after he had been disciplined for this pattern of disruption and had received a 'final warning,' he continued to approach other employees and prevent them from completing their assigned tasks

in a timely manner." *General Indicator,* 707 F.2d at 283. The court concluded that the discharged employee's tenure with the company was "a continual pattern of disruptive and insubordinate behavior and activities as well as ... interfer[ence] with productivity." *Id.* By contrast, the Board found that Ramirez's behavior was neither disruptive nor threatening and that he voluntarily discontinued the solicitation of any employee who failed to express at least some interest in the union.

Similarly, the company's contention that the Board "faulted" Ramirez's co-workers "for complaining to their supervisors rather than directly confronting Ramirez" is groundless. Contrary to our dissenting colleague's criticism, the Board did not assume that Ramirez's co-workers had a "duty ... to inform Ramirez he was disturbing their work." Again, the Board considered various relevant factors in order to determine whether Ramirez's conduct was protected by the Act. One of the factors the Board considered relevant was that Ramirez was persistent only with those who gave "tepid or inconclusive responses." *Frazier,* 328 N.L.R.B. No. 89, at 13. Therefore, when the Board stated that "there is no evidence that employees whom Ramirez solicited more than once ever told him that he was interfering with their work or that further solicitations would have that effect," the Board was not applying a general requirement that a behavior does not constitute harassment until there is a direct confrontation. Instead, the Board was merely emphasizing that Ramirez, while persistent as a union organizer, did not bother anyone who expressly indicated that he was not interested or that he did not want to be bothered. Therefore, the company's claim that the Board inappropriately required employees to rebuke Ramirez first before complaining to the management is a wholly inaccurate account of the Board's opinion.

█ Given that Ramirez's union activities are protected under the Act, the remaining question is whether the compa-

ny's discharge of Ramirez was lawful. The Board found that Ramirez's discharge was unlawful because "the chain of events leading to the discharge was a direct result of the [company's] enforcement of its unlawful rule prohibiting talk about the Union during worktime." *Frazier*, 328 N.L.R.B. No. 89, at 2. There is substantial evidence in the record to support this finding. Here, context is everything. The company promulgated an invalid rule prohibiting employees from talking about the union during working time. *See Industrial Wire Prods.*, 317 N.L.R.B. 190, 190 (1995). That rule was implemented in direct response to rumors of Ramirez's union organizing efforts, and the employees who subsequently informed the company of Ramirez's work time solicitations were acting in accordance with the company's directive that they report union "talk" to management. In addition, the company's activities in violation of § 8(a)(1), violations the company does not challenge, included threatening to discharge employees who engaged in union activities, coercively interrogating employees about their union activities and sympathies, expressing disappointment in employees who attended union meetings, threatening to close the plant if employees chose union representation, threatening to retaliate against employees for their union activities, and remarking to an employee after Ramirez's discharge that the employee should now understand why he should not talk about the union on company time. Such factual findings by the Board constitute substantial evidence to support its finding that Ramirez's discharge by the company violated § 8(a)(3) and (1) of the Act.

Nor, as the company contends, did the Board's conclusion contradict *Patrick Industries* and *BJ's Wholesale*. In *Patrick Industries*, the Board found that the company's discipline, while unlawful under § 8(a)(1), did not independently violate § 8(a)(3) because "the discipline was not discriminatory and was not done in order to encourage or discourage membership in any labor organization." *Patrick Indus.*, 318 N.L.R.B. at 248. As noted, the

Board's finding in the instant case was based on numerous indications of the company's discriminatory prohibition on union talk, its repeated solicitation of complaints regarding union solicitation, and numerous other instances reflecting the company's anti-union animus. The company's reliance on *BJ's Wholesale* fares no better. As the Board explained, in *BJ's Wholesale*, the employee had previously been counseled under the employer's anti-harassment policy for conduct unrelated to the union, and, unlike the instant case, the employer had not promulgated an unlawful rule prohibiting all working-time union speech. *See BJ's Wholesale*, 318 N.L.R.B. at 684. Moreover, in finding the discipline in *BJ's Wholesale* to be lawful, the Board emphasized that the employer had not solicited complaints from employees about union activity. *See id.* The record here shows that the company repeatedly solicited complaints about union "harassment," and that Moosman told the employees that he "wanted to know about it if some one was talking to [them] about the union on company time." Moreover, the purported "complaint" from Jennings that immediately precipitated Ramirez's discharge was directly solicited by Haga's inquiry as to whether Ramirez was harassing him. Therefore, the Board's findings are consistent with *BJ's Wholesale* and *Patrick Industries*.

■ The Board reasonably rejected the company's *Wright Line* defense that Ramirez would have been terminated even in the absence of the protected activity because of his insubordination and dishonesty when questioned by Haga. Substantial evidence supports the Board's finding that Haga decided to terminate Ramirez for the union activities, and not for insubordination and dishonesty. As the Board emphasized, Haga initially testified that Ramirez was discharged solely for "harassing" company employees. In addition, none of the company's filings with regard to Ramirez's application for unemployment benefits mentioned any grounds for termi-

nation other than alleged harassment. Therefore, the company has failed to provide sufficient evidence to overcome the Board's finding that it would have terminated Ramirez even in the absence of the protected activity for his insubordination and dishonesty. In the end, the company offers no reason for the court to disturb the Board's finding of unlawful discharge.

## III.

The company also challenges the Board's remedy, contending that the Board abused its discretion by awarding Ramirez reinstatement. The company takes the position that Ramirez's failure to disclose fully his employment history at the time he applied for employment as a welder and his false statements regarding his union activities on his unemployment benefit application warranted immediate termination and preclude reinstatement. The company relies on the after-acquired evidence rule of *McKennon v. Nashville Banner Publishing Company*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), which held that "neither reinstatement nor front pay is an appropriate remedy" for an unlawful termination "where there is after-acquired evidence of wrongdoing that would have led to termination on legitimate grounds had the employer known about it." *Id.* at 361–62, 115 S.Ct. 879. Following *McKennon*, the Board has limited reinstatement and backpay based on after-acquired evidence that an employee who was unlawfully discharged had engaged in misconduct that would have led to the employee's termination. *See, e.g., Marshall Durbin Poultry Co.*, 310 N.L.R.B. 68, 70 (1993), *enforced in pertinent part*, 39 F.3d 1312, 1317 (5th Cir. 1994); *John Cuneo, Inc.*, 298 N.L.R.B. 856, 857 (1990); *Axelson, Inc.*, 285 N.L.R.B. 862, 866 (1987). The difficulty for the company stems from the fact that it makes a bare assertion.

The *McKennon* Court explained, "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362–63, 115 S.Ct. 879. The Court added that "[t]he concern that employers might as a routine matter undertake extensive discovery into an employee's background or performance on the job to resist claims is not an insubstantial one." *Id.* at 363, 115 S.Ct. 879. Accordingly, the Board has placed on the employer the burden of showing that it *would have* discharged the employee because of the misconduct, not simply that it *could have* done so. *See, e.g., Marshall Durbin*, 310 N.L.R.B. at 70; *John Cuneo*, 298 N.L.R.B. at 859. The Board has broad remedial discretion to devise remedies that effectuate the policies of the Act, *see ABF Freight System, Inc. v. NLRB*, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994), and because the company has not produced evidence to overcome that deference and to show that it would have terminated Ramirez's employment for his misconduct, we find that the Board did not abuse its discretion in ordering reinstatement.

It is undisputed that Ramirez falsified his employment application by omitting information about his previous employment with G&L Metal; however, the Board reasonably concluded that the company failed to show that he would have been discharged for his failure to disclose the information had the company learned about it before the discharge. As the Board noted, the employment application that Ramirez filled out states merely that false information, omissions, or misrepresentations *may* result in a discharge of the employee. *See Frazier*, 328 N.L.R.B. No. 89, at 15. In other words, the language on the form warns of dismissal only as a potential option, and the company has provided no evidence that its practice has been to dismiss employees for similar omissions. The company's assertion that the company's policy manual, which specifies that "[f]alsifying or altering Company records" is a violation "warranting immedi-

ate dismissal of an employee," is sufficient evidence that it would have discharged Ramirez for his omission fails not only because the manual was not distributed to him before the termination of his employment and there is no evidence otherwise to indicate that he was made aware of this falsification rule, but because the company offered no evidence that it has routinely dismissed employees for similar omissions.

Similarly, the company's reliance on the evidence of Ramirez's false statement on his unemployment benefits application is misplaced. The company has not provided sufficient evidence to show that Ramirez's misrepresentations amounted to "[f]alsifying or altering Company records," given that it is not obvious why unemployment insurance applications filed with a state agency would be considered company records for the purposes of the company policy at issue. Neither has the company proffered any other evidence to show that Ramirez's misconduct precludes his reinstatement. While we do not understand the Board to suggest that the company would have to demonstrate that other employees had been discharged on this ground, as there will always be a first case, a bare assertion merely referring to a company policy that seems remotely related is insufficient. Hence, the Board reasonably distinguished *Vilter Mfg. Corp.*, 271 N.L.R.B. 1544 (1984), in which the Board found no unfair labor practice for failure to reinstate a discharged employee where the employer demonstrated that an employee's post-termination dishonesty would have resulted in the employee's discharge under the employer's progressive discipline system. *See Frazier*, 328 N.L.R.B. No. 89, at 15; *Vilter*, 271 N.L.R.B. at 1546–47.

Accordingly, we deny the petition and remand the case for enforcement of the Board's order.

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

I would grant the petition for review for the reasons expressed so convincingly by the dissenting member of the National La-

bor Relations Board. John Ramirez repeatedly pestered the same employees while they were trying to perform their jobs, as many as four times in a single day and once almost to the point of a physical fight. This was not protected activity but harassment. His fellow employees were under no duty, as the majorities of this panel and of the Board seem to think, to inform Ramirez he was disturbing their work. That should have been, and surely was, as obvious to him as it was to them. As the dissenting Board member noted, Ramirez's discharge did not violate section 8(a)(1) or (3) of the National Labor Relations Act because the employer "was lawfully responding to multiple complaints from multiple employees regarding Ramirez' repeated harassment of them during worktime about the Union." *Frazier Indus. Co.*, 328 N.L.R.B. No. 89, slip op. at 59 (1999) (footnote omitted). Further, "even assuming that the General Counsel has established a prima facie showing that Ramirez' protected conduct was a motivating factor in his discharge, the Respondent has met its burden of showing that the discharge would have occurred even in the absence of protected activity." *Id.* (citing *Wright Line*, 251 N.L.R.B. 1083 (1980), enf'd., 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)). Accordingly I dissent.