Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Submitted September 25, 2003      Decided October 21, 2003

No. 02-1278

SHAMROCK FOODS COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

————

Consolidated with
02–1323

————

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

————

*Scott V. Kamins* was on the brief for petitioner.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Charles Donnelly*, Supervisory Attorney, and *Jeffrey L. Horowitz*, Attorney, National Labor Relations Board, were on the brief for respondent.

Before: HENDERSON, TATEL and GARLAND, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Shamrock Foods Company petitions for review of a decision and order of the National Labor Relations Board (NLRB), and the Board cross-applies for enforcement of its order. The Board found that Shamrock violated section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), by, among other things, discharging an employee for allegedly committing misconduct in the course of soliciting his co-workers for the union. For the reasons set forth below, we deny Shamrock's petition for review and grant the Board's cross-application for enforcement.[1]

I

Shamrock is a wholesale distributor and seller of food products that maintains offices nationwide. We are concerned here with activities that took place at Shamrock's Phoenix, Arizona facility, which employs some 500 warehouse workers and drivers. In April 1998, Teamsters Local Union No. 104 began a campaign to organize the Phoenix employees. In pursuit of that goal, the union filed a petition for a representation election on June 16, 1998. Four months later, the union charged Shamrock with committing unfair labor practices in connection with the organizing campaign. Based on that charge, the NLRB's General Counsel issued a complaint against Shamrock. The complaint alleged, inter alia, multiple violations of section 8(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights to join or assist a labor organization. 29 U.S.C. § 158(a)(1); *see id.* § 157.

_____

[1] This case was considered on the record from the NLRB and on the briefs submitted by the parties. *See* Fed. R. App. P. 34(a)(2); D.C. Cir. Rule 34(j).

After a two-day hearing, an Administrative Law Judge (ALJ) sustained the General Counsel's complaint in part. With one exception, the Board affirmed. *See Shamrock Foods Co.*, 337 N.L.R.B. No. 138 (July 30, 2002). In its petition for review, Shamrock raises multiple objections to the NLRB's decision. The standard of review we apply to such objections is one we have stated many times before: "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, . . . or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Pioneer Hotel, Inc. v. NLRB*, 182 F.3d 939, 942 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

In the following parts, we examine Shamrock's challenges to two of the NLRB's determinations: (1) that Shamrock unlawfully discharged employee Vincent D'Anella; and (2) that it unlawfully interrogated employee David Trujillo. Shamrock's other challenges to the NLRB's determinations require no elaboration by this court, and we deny them for the reasons set forth by the Board and its ALJ.

## II

We begin our discussion with Shamrock's discharge of Vincent D'Anella, a widely acknowledged leader of the 1998 unionization effort. At the time of his October 8, 1998, discharge, D'Anella had been working for Shamrock for almost five years and had a spotless record. *See Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 7 (ALJ Op.). Although Shamrock admits that it discharged D'Anella during the organizing campaign, it maintains that it did so not for his unionization efforts, but because he physically threatened fellow workers Chris Hargenrader and Daniel Brooks in connection with soliciting them for union authorization cards.

The ALJ and the Board analyzed D'Anella's discharge utilizing the framework approved by the Supreme Court in *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964). Under *Burnup & Sims*, "§ 8(a)(1) is violated if it is shown that the

discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct." 379 U.S. at 23; *see Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 29 (D.C. Cir. 1998). In this case, the first three parts of the *Burnup & Sims* inquiry are easily satisfied: it is clear that D'Anella was engaged in protected activity when he solicited his co-workers for the union; there is no doubt that Shamrock knew that such activity was protected; and the express basis for the discharge was D'Anella's alleged misconduct in the course of that otherwise protected activity. *See Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 7 (ALJ Op.) ("Respondent charges that D'Anella threatened two employees ... with 'violent repercussions *related to* his efforts to secure their support for the Teamsters....'" (quoting Shamrock's NLRB Reply Br. at 2) (emphasis added)).

The only remaining question is whether D'Anella did, in fact, threaten the two employees. The evidence that he did rested largely on the testimony of Hargenrader and Brooks. D'Anella, however, denied making the threats; indeed, he testified that he did not even know Brooks and that he had never solicited Brooks' union card. D'Anella's testimony on the latter point was corroborated by employee Luigi Baratta, who testified that it was he who solicited Brooks' card and that D'Anella was not present at the time. In light of this clash of testimonies, "the case turn[ed] primarily on credibility resolutions by the trier of fact as to the various accounts provided concerning the purported threats." *Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 8 (ALJ Op.). Based both on the "testimonial demeanor" of the company's witnesses, and on their behavior subsequent to the allegedly threatening conversations, the ALJ concluded that "the accounts of threats and intimidation attributed to D'Anella by Hargenrader and Brooks lack any credible quality." *Id.* at 10. The ALJ thus determined that D'Anella had not engaged in the alleged misconduct, and, following *Burnup & Sims*, concluded that Shamrock violated section 8(a)(1) by discharging him.

Shamrock disputes the NLRB's determination on a number of grounds. First, it argues that the Board's finding that D'Anella did not threaten his co-workers is unsupported by substantial evidence. That contention cannot be sustained, however, as the Board's finding was supported by the testimony of both D'Anella and Baratta. Although Hargenrader and Brooks testified to the contrary, the ALJ did not find them credible. And while Shamrock urges us to set that finding aside, "we do not reverse the Board's adoption of an ALJ's credibility determinations unless, unlike here, those determinations are 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *Cadbury Beverages, Inc.*, 160 F.3d at 28 (quoting *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998)); *see Vico Products Co., Inc. v. NLRB*, 333 F.3d 198, 209 (D.C. Cir. 2003).

Second, Shamrock contends that the Board misapplied the *Burnup & Sims* test by refusing to give the company an opportunity to demonstrate that, even if the threats were never made, it had a good faith belief that they were. This argument, however, misapprehends *Burnup & Sims*. As the Supreme Court made clear in that case, the employer's good faith is simply not relevant if the misconduct did not occur: "Over and again the Board ha[s] ruled that § 8(a)(1) is violated if the employee is discharged for misconduct arising out of a protected activity, *despite the employer's good faith*, when it is shown that the misconduct never occurred." *Burnup & Sims*, 379 U.S. at 23 (emphasis added).[2] The Court explained the rationale for that rule as follows:

---

[2] *See Cadbury Beverages*, 160 F.3d at 29 ("In cases involving employee discipline for alleged misconduct in the course of a protected activity that the employer knew was protected, an employer violates section 8(a)(1) if it is proven that the alleged misconduct did not occur, whether or not the employer acted in good faith."); *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1222 (6th Cir. 1990) (same); *Allied Indus. Workers, AFL–CIO Local Union No. 289 v. NLRB*, 476 F.2d 868, 880 (D.C. Cir. 1973) (same).

> Th[e] rule seems to us to be in conformity with the policy behind § 8(a)(1). Otherwise the protected activity would lose some of its immunity, since the example of employees who are discharged on false charges would or might have a deterrent effect on other employees. Union activity often engenders strong emotions and gives rise to active rumors. A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith. It is the tendency of those discharges to weaken or destroy the § 8(a)(1) right that is controlling.

*Id.* at 23–24.

It is true that there is a burden-shifting element to the *Burnup & Sims* test that involves proof of the employer's good faith: "If the employer establishes its honest belief [that the discharged employee was guilty of the misconduct], the burden shifts to the General Counsel to show that the misconduct did not occur." *TCI Cablevision of Montana, Inc. v. NLRB*, 2002 WL 31818246, at *1 (D.C. Cir. 2002); *see Burnup & Sims*, 379 U.S. at 23 n.3.[3] But in a case like this one, in which the ALJ imposed the burden of proof on the General Counsel from the outset, proof of good faith — which does nothing more than place the burden on the General Counsel — is unnecessary and irrelevant.

Third, Shamrock protests that the ALJ did not, in fact, impose the burden of proof on the General Counsel as required by *Burnup & Sims*. There is no question, however, that the ALJ properly assigned the burden. Indeed, his opinion states both that "the General Counsel has the burden of showing that the employee did not, in fact, commit the misconduct," *Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 10, and that the "General Counsel has sustained his burden of proving that Respondent violated Section 8(a)(1) by suspend-

---

[3] *See also Dallas Gen. Drivers v. NLRB*, 389 F.2d 553, 554–55 (D.C. Cir. 1968); *Pepsi-Cola Co.*, 330 N.L.R.B. 474, 474–75 (2000).

ing and discharging D'Anella," *id.*[4] Shamrock complains that, despite what he said, the ALJ effectively shifted the burden of proof to the company by basing his decision on his disbelief of the company's witnesses, rather than on affirmative evidence that the alleged misconduct did not occur. But whether or not disbelief in the testimony of one party's witnesses can be sufficient to satisfy the opposing party's burden of proof in an NLRB proceeding,[5] there was more than just disbelief here. Rather, the ALJ relied on D'Anella's direct testimony that he neither threatened nor harassed his fellow employees, testimony that was corroborated in important part by both Baratta and another employee, Frank Meza.

Finally, Shamrock argues that the Board erred by using the *Burnup & Sims* test in the first place, rather than applying the better-known *Wright Line* formula. *See Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981); *see also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 399–401 (1983). Under *Wright Line*, the General Counsel must first show that the employee's "protected conduct was a 'motivating factor' in the employer's decision" to take an adverse employment action. *Wright Line*, 251

---

[4] As Shamrock notes, at one point the ALJ referred to, and rejected, what he characterized as Shamrock's "affirmative defense" — a reference that Shamrock interprets as requiring it to bear the burden of proof. *Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 10 (ALJ Op.). In context, however, it is clear that the ALJ's reference was not to the burden of proof under *Burnup & Sims*, but to Shamrock's claim that the company was entitled to an affirmative defense of good faith under the *Wright Line* test. The Board itself disavowed the ALJ's entire discussion of good faith, correctly concluding — as we discuss below — that *Wright Line* is inapplicable here. *See id.* at 1.

[5] *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (noting, in a Title VII case, that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"); *United States v. Zeigler*, 994 F.2d 845, 848–50 (D.C. Cir. 1993) (highlighting problems that this issue poses for appellate review of jury verdicts).

N.L.R.B. at 1089. "Once this is established, the burden . . . shift[s] to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Id.*; *see Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125–26 (D.C. Cir. 2001). *Wright Line* is the test the Board uses when an employer has discharged (or disciplined) an employee for a reason assertedly *unconnected to* protected activity — for example, poor performance. In such cases, the central question is whether the discharge was motivated by anti-union animus, and the Board uses variations on *Wright Line*'s burden-shifting framework to test the veracity and sufficiency of the employer's explanation. *See Wright Line*, 251 N.L.R.B. at 1083–84 (discussing pretext and dual motive cases); *see also Transportation Mgmt. Corp.*, 462 U.S. at 398–400; *Southwest Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1339 n.7 (D.C. Cir. 1995).

As the Board explained below, however, and as this court has explained before, *Wright Line* is inapplicable to cases — like this one — in which the employer has discharged the employee because of alleged misconduct "in the course of" protected activity. *Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 1; *see Cadbury Beverages*, 160 F.3d at 29 n.4 (rejecting the applicability of *Wright Line* to such cases); *E.W. Grobbel Sons*, 322 N.L.R.B. 304, 304–05 (1996) (same), *enforcement denied on other grounds*, 149 F.3d 1183 (6th Cir. 1998). In such cases, *Burnup & Sims* makes clear that the employer's "motive is not at issue," and that the only question is whether the alleged misconduct actually occurred. *Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 1; *see Cadbury Beverages*, 160 F.3d at 29 (holding that "*Burnup & Sims* explicitly obviates the need to inquire into intent"). Accordingly, the *Wright Line* test — the function of which is to ferret out the motives for a discharge — is inapplicable. As we explained in *Cadbury Beverages*, the *Wright Line* analysis "is generally appropriate in the sort of case in which the general counsel's charge is based on an unlawful motive — it gives the employer the opportunity to prove that, despite any unlawful motive, the same action would have occurred pursuant to some additional, lawful motive." 160 F.3d at 29 n.4.

"But since *Burnup & Sims* imposes liability for an employment action erroneously taken because of alleged misconduct, regardless of motive, . . . it is plainly irrelevant whether [the employer's] proffered reason for acting was pretextual" or whether it would have taken the same action for a lawful reason. *Id.*

Shamrock contends that, the above notwithstanding, this case cannot be distinguished from *Frazier Industrial Co., Inc. v. NLRB*, 213 F.3d 750, 757 (D.C. Cir. 2000), in which we applied *Wright Line* to similar facts. But *Frazier* is not inconsistent with the *Burnup & Sims* framework. Unlike Shamrock, the employer in *Frazier* gave not one but two rationales for discharging a union organizer. First, as in this case, the employer contended that it fired the employee because he had engaged in unprotected harassment in the course of his otherwise protected efforts to persuade co-workers to sign union authorization cards. *Frazier Indus. Co.*, 213 F.3d at 756. Although we did not mention *Burnup & Sims*, our analysis of this first claim was consistent with our analysis here: we asked only whether the alleged harassment actually occurred, and, after determining that it did not, we did not further inquire into the employer's good faith. *Id.* at 756–59.[6]

Having rejected the employer's first claimed rationale, we then turned to its second: that "even if [the employee's] actions constituted protected activities, its termination of [his] employment was lawful because it would have discharged him in the absence of protected conduct for his insubordination and dishonesty." *Id.* at 756; *see id.* at 759. This second rationale was aptly characterized as "the company's *Wright Line* defense," because the misconduct to which it referred — insubordination and dishonesty — was not alleged to have occurred in the course of protected union solicitation, but rather during a subsequent conversation between the employ-

---

[6] That analysis was conducted in connection with the first step in the *Wright Line* test, which asks whether "protected activity" motivated the adverse employment action. *Frazier Indus. Co.*, 213 F.3d at 755–56 (citing *Wright Line*, 251 N.L.R.B. at 1089).

ee and his supervisor. *Id.* at 759–60.[7] Shamrock, by contrast, did not offer a rationale for firing D'Anella that was unconnected to his union activity, and the Board therefore rightly declined to apply *Wright Line* to this case.

In sum, we conclude that the NLRB properly applied the *Burnup & Sims* test to the discharge of D'Anella, and that the Board's conclusion that Shamrock violated section 8(a)(1) is supported by substantial evidence.

## III

We next consider the NLRB's determination that Shamrock's night-shift manager, Bud Shalley, unlawfully interrogated warehouse worker David Trujillo about the union's organizing efforts. Trujillo testified that on or about June 4, 1998, in the midst of the organizing campaign, Shalley approached him while he was sitting alone in a warehouse office completing paperwork. After a few moments of small talk, Shalley asked Trujillo if he had heard anything about the union and whether D'Anella had asked Trujillo to sign a union card. When Trujillo answered that he had "not yet" been asked, Shalley walked out of the office. J.A. at 83. A few days later, on June 9, Shalley again approached Trujillo in the warehouse office. This time, Shalley said: "I can't believe Vinnie [D'Anella] hasn't come to you yet about the union." When that remark failed to evoke a response, Shalley followed up with: "Well, if you find out that Vinnie's trying to hand out union cards, let me know." *Id.* at 83–84. Trujillo testified that he promised Shalley that he would keep his "eyes open." *Id.* at 84; *see Shamrock Foods* Co., 337 N.L.R.B. No. 138, at 4 (ALJ Op.).

Although Shalley denied that either conversation took place, the ALJ credited Trujillo's account and concluded that

---

[7] Applying *Wright Line*, we went on to hold that the Board reasonably rejected the employer's defense because "[s]ubstantial evidence support[ed] the Board's finding that [the plant manager] decided to terminate [the employee] for the union activities, and not for insubordination and dishonesty." *Frazier Indus. Co.*, 213 F.3d at 759.

the conversations, as described by Trujillo, violated section 8(a)(1). The Board affirmed. In its petition for review, Shamrock contends both that the conversations never took place, and that even if they did, they did not violate the NLRA.

We first address Shamrock's fallback argument that even if the conversations did occur, they were not unlawful. This argument requires little discussion. The questioning of an employee about union activities or sympathies constitutes unlawful interrogation "if, under all the circumstances, it reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998) (internal quotation marks omitted). Here, in the midst of a heated union campaign, a Shamrock manager twice approached Trujillo — who was not an open union supporter — and questioned him about the activities of a union organizer, eliciting a promise from the employee that he would keep his "eyes open." J.A. at 84. The questioning was unaccompanied by any assurance against reprisal, took place when Trujillo was alone, and had no apparent legitimate purpose. Recognizing the Board's "'competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship,'" *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 106 (D.C. Cir. 2003) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969)), we find nothing unreasonable in the Board's conclusion that these conversations, if they occurred as alleged, were sufficiently coercive to violate the Act. *See, e.g., Perdue Farms*, 144 F.3d at 835–36; *Avecor, Inc. v. NLRB*, 931 F.2d 924, 931 (D.C. Cir. 1991); *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1176–80 (D.C. Cir. 1987); *Midwest Reg'l Joint Bd. v. NLRB*, 564 F.2d 434, 443 (D.C. Cir. 1977).

Shamrock's principal contention is that substantial evidence does not support the ALJ's finding that the conversations between Shalley and Trujillo took place at all. But there plainly is such evidence: namely, Trujillo's own testimony. And while, as the ALJ recognized, "Shalley flatly denied Trujillo's assertions," *Shamrock Foods Co.*, 337 N.L.R.B. No.

138, at 4 n.6, we must defer to the judge's assessment that Shalley's testimony was not credible, *id.*

Shamrock argues that Shalley's claim, that he did not talk to Trujillo about the union on June 4 or 9, is proven by the fact that he did not even *know* about the union's organizing efforts until later that month. Although the ALJ acknowledged Shalley's claim of ignorance, he also noted that Frank Meza, a warehouse employee and union supporter, had testified to the contrary. According to Meza, an "upset" Shalley spoke to him about unionization around June 1, 1998, saying "[w]e really don't need a union unless you're mistreated" and "[t]hey don't need a union here." *Id.* at 3 (quoting J.A. at 98). After evaluating both Shalley's and Meza's testimony, the ALJ concluded: "[Shalley] claims that he first learned of the union drive and D'Anella's activity later in June. However, as Meza's account of an earlier conversation is uncontradicted, I do not credit Shalley's denials here." *Id.* at 4 n.6.

Shamrock seizes on the word "uncontradicted" in the preceding quotation, insisting that it demonstrates that the ALJ was unfamiliar with the factual record. Meza's account was not "uncontradicted," Shamrock points out, because Shalley himself contradicted it by denying that he had ever spoken with Meza about the union. According to Shamrock, the ALJ's "ignorance of the record" on this point means that his decision rests on a "mistaken notion," and hence that it cannot be sustained. Shamrock Reply Br. at 21.

But Shamrock is grasping at straws. There is no doubt that the ALJ knew full well that Shalley had denied speaking with Meza, because the ALJ expressly said so at the outset of the same section of his opinion. *See Shamrock Foods Co.*, 337 N.L.R.B. No. 138, at 3 ("Shalley denied that he made the statements attributed to him by employees Frank Meza and David Trujillo detailed below."). It is clear, then, that the ALJ was fully conversant with the record and simply concluded that Meza's testimony was uncontradicted by credible evidence. And as the ALJ's decision to credit the testimony of Meza and Trujillo rather than that of Shalley is not "patently unsupportable," we must and do defer to it. *Tasty*

13

*Baking*, 254 F.3d at 124 (internal quotation marks omitted). Accordingly, we have no cause to set aside the Board's conclusion that Shamrock, through Shalley, unlawfully interrogated David Trujillo in violation of section 8 (a)(1).

## IV

For the foregoing reasons, we deny Shamrock's petition for review and grant the Board's cross-application for enforcement of its order.