******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AFSCME, AFL-CIO, COUNCIL 4, LOCAL 2405 *v.* CITY
OF NORWALK ET AL.
(AC 35917)

Beach, Prescott and Foti, Js.

*Argued October 27, 2014—officially released March 24, 2015*

(Appeal from Superior Court, judicial district of New
Britain, Cohn, J.)

*J. William Gagne, Jr.*, with whom, on the brief, was
*Kimberly A. Cuneo*, for the appellant (plaintiff).

*M. Jeffry Spahr*, deputy corporation counsel, for the
appellee (named defendant).

*Frank N. Cassetta*, assistant general counsel, for the
appellee (defendant State Board of Labor Relations).

*Opinion*

PRESCOTT, J. General Statutes § 7-470 (a) (1) prohibits municipal employers from "[i]nterfering, restraining or coercing employees in the exercise of the rights guaranteed in section 7-468"[1] of the Municipal Employee Relations Act (MERA), General Statutes § 7-460 et seq. This administrative appeal arises out of a prohibited practice complaint filed by the plaintiff, AFSCME, AFL-CIO, Council 4, Local 2405 (union), against the defendant city of Norwalk (city), alleging that supervisory personnel employed by the city's Department of Public Works (department) engaged in conduct prohibited by § 7-470 (a) (1) after one of the union's members filed a grievance against the department. The State Board of Labor Relations (board), a codefendant in this case, denied the union's complaint after concluding that the union had failed to prove a prima facie case that the city violated § 7-470 (a) (1). The dispositive issue in this appeal is whether substantial evidence supported the board's decision. We conclude that it did and, accordingly, affirm the judgment of the trial court dismissing the union's appeal.

The following facts, which are relevant to our resolution of this appeal, were found by the board. The union represents a bargaining unit composed of city employees assigned to the department. On December 21, 2009, Christopher Torre, a department supervisor, held a snowplow crew meeting to address complaints that snow had not been properly removed from intersections during a storm the previous weekend. At some point during this meeting, Torre asked three crew members why they were late arriving to the meeting. One of the crew members, Hector DeJesus, responded that he was late because he had been conducting union business. Torre responded that union business during work hours must be preapproved by the department's director, and that the city and/or Torre " 'owns you from 7 to 3.' " DeJesus responded that certain union business did not require preapproval. Torre disputed DeJesus' claim, discussed the manner in which intersections should be plowed in the future, and adjourned the meeting.

Approximately nine days later, Lawrence Taylor, a crew member who attended the meeting held by Torre, filed a grievance on a form filled out by DeJesus alleging that "[Torre's] . . . constant racist statements, telling the men . . . I own you from 7 a.m. till 3:30 p.m. . . . [and scare] tactics are in violation [of the parties' collective bargaining agreement] and [d]iscrimination [l]aws . . . ." Two or three days after filing the grievance, Taylor received a telephone call from Torre during which Torre told him that he should " 'not go down that road' " with DeJesus and Milton Giddiens, the union's president. Taylor asked Torre if Torre was threatening him, and Torre denied that he was. Taylor then told Torre that his crew did not like Torre or his scare

tactics, and the conversation ended.

On January 5, 2010, Torre told DeJesus that his truck was dirty and directed him to wash it. DeJesus responded that the truck had just been washed and still had soap residue on it. He further told Torre to speak with another supervisor to confirm that the truck had been washed. Torre responded by taking photographs of DeJesus' truck. Around the same time, Torre told other employees within the department that the city had previously terminated DeJesus' employment for taking money from a customer, but that the city was forced to reinstate him on the basis of a technicality. Two days later, a member of the union's executive board heard Torre singing "Back Stabbers," a popular rhythm and blues song, loudly near the entrance to the cafeteria.

Approximately three days after the dispute over the cleanliness of DeJesus' work vehicle, the department's director, Harold Alvord, reminded Giddiens in a letter that a longstanding department policy required union members to seek preapproval before conducting union business during work hours. Four days later, Alvord sent Giddiens a memorandum denying Taylor's grievance.

The union subsequently filed a prohibited practice complaint against the city claiming that Torre's actions in (1) calling Taylor and encouraging him to withdraw his grievance, (2) directing DeJesus to clean his work vehicle, and (3) notifying the union that it would begin enforcing the department's policy of requiring union members to seek preapproval before conducting union business during work hours[2] interfered with, restrained, and coerced employees in the exercise of rights guaranteed in MERA and, as a consequence, violated § 7-470 (a) (1).[3]

The board held a hearing on the union's complaint and, with one member dissenting, dismissed it after concluding that the union had failed to make a prima facie showing that the city had discriminated against department employees on the basis of their protected activity. In doing so, the board also considered and rejected an additional claim not raised in the union's complaint that Torre had improperly disclosed DeJesus' past disciplinary history to other city employees.

The union appealed from the board's decision to the trial court, which dismissed the union's appeal after concluding that substantial evidence supported the board's decision. The union then appealed to this court from the judgment of the trial court. Additional facts will be set forth as necessary.

The union advances two principal claims. First, it claims that the trial court improperly concluded that the board applied the proper standard in determining that the city did not violate § 7-470 (a) (1). Second, it

claims that the trial court improperly concluded that the board's determination that the union failed to demonstrate the existence of antiunion animus was supported by substantial evidence.[4] In light of the manner in which this case has been litigated by the union, we are not persuaded.

I

We turn first to the union's claim that the board failed to apply the proper standard in determining that the city did not violate § 7-470 (a) (1). We begin our analysis of this claim by setting forth the well established standard governing our review. "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and the scope of that review is limited. . . . When reviewing the trial court's decision, we seek to determine whether it comports with the [UAPA]. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Conclusions of law reached by the administrative agency must stand if . . . they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of [its] discretion." (Citations omitted; internal quotation marks omitted.) *Dickman* v. *Office of State Ethics, Citizen's Ethics Advisory Board*, 140 Conn. App. 754, 766–67, 60 A.3d 297, cert. denied, 308 Conn. 934, 66 A.3d 497 (2013).

Our Supreme Court has previously recognized that "[MERA] . . . is closely patterned after the National Labor Relations Act [(NLRA), codified at 29 U.S.C. § 151 et seq.] . . . [and] the language of these [acts] is essentially the [same] . . . ." (Internal quotation marks omitted.) *Labbe* v. *Pension Commission*, 239 Conn. 168, 193 n.3, 682 A.2d 490 (1996). Accordingly, "[i]n judging whether the labor board's interpretation was reasonable, we may look to federal labor law for guidance in construing our labor relations acts." *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 120, 584 A.2d 1172 (1991); see *Board of Education* v. *State Board of Labor Relations*, 299 Conn. 63, 80, 7 A.3d 371 (2010) ("because Connecticut statutes dealing with labor relations have been closely patterned after the [NLRA] . . . the federal statute is of great assistance and persuasive force in the interpretation of our own acts" [citation omitted; internal quotation marks

omitted]); *Stratford* v. *Local 134, IFPTE*, 201 Conn. 577, 589, 519 A.2d 1 (1986) ("[T]he language of "[MERA] . . . and of the [NLRA] . . . is essentially the same. . . . Therefore, the judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own acts." [Citations omitted; internal quotation marks omitted.]); *Winchester* v. *State Board of Labor Relations*, 175 Conn. 349, 354, 402 A.2d 332 (1978) ("[MERA] . . . is closely patterned after the [NLRA] . . . which a comparison of the two acts clearly demonstrates. . . . This court has stated that it is for this reason that the judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own act. . . . In speaking of the similarity of language that exists between the [NLRA] . . . and . . . MERA, we have often noted that the language of these [acts] is essentially the same . . . ." [Citations omitted; internal quotation marks omitted.]).

Section 7-470 (a) (1), which is almost identical to § 8 (a) (1) of the NLRA, codified at 29 U.S.C. § 158 (a) (1),[5] provides that "[m]unicipal employers or their representatives or agents are prohibited from . . . [i]nterfering, restraining or coercing employees in the exercise of the rights guaranteed in section 7-468 . . . ." The board has interpreted this provision as prohibiting employers from harassing, retaliating, or discriminating against employees because they exercised rights guaranteed by MERA. See *In re Bridgeport Housing Authority*, Conn. Board of Labor Relations, Decision No. 4754 (August 7, 2014) ("[i]t is a prohibited practice within the meaning of [MERA] for an employer to discriminate or retaliate against an employee for engaging in union or other protected activities"); *In re Hartford*, Conn. Board of Labor Relations, Decision No. 3785 (August 22, 2000) ("[s]ection 7-470 [a] [1] of [MERA] prohibits an employer from harassing and retaliating against an employee for engaging in protected, concerted activity"). In analyzing claims of this nature, the board has traditionally applied the burden-shifting framework first developed and described by the National Labor Relations Board (NLRB) in *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), enf'd, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d. 848 (1982).[6] Pursuant to this framework, a complainant must make an initial prima facie showing that an employee's protected activity was a motivating factor in the employer's adverse employment action against an employee. Id. "The elements of this prima facie case are (1) the employee was engaged in protected activity; (2) . . . the employer knew of the employee's protected activity; and (3) . . . the employer acted as it did on the basis of anti-union animus." (Internal quotation marks omitted.) *N.L.R.B.* v. *RELCO Locomotives, Inc.*, 734 F.3d 764, 780 (8th Cir. 2013). Once the complainant has satisfied its initial burden under *Wright Line*, the

burden shifts to the employer to prove that it would have taken the same action regardless of the employee's protected activity. *Wright Line*, supra, 1089. In other words, if the employee or union raises a prima facie case that the employer acted as it did on the basis of antiunion animus, the employer may avoid liability by demonstrating that such animus, if any, did not motivate its decision to take adverse employment action against the employee.

Applying *Wright Line* to each of the union's claims, the board concluded that the union had failed to establish a violation of § 7-470 (a) (1) because it did not prove the third element of its prima facie case, namely, that the city's actions were motivated by antiunion animus. Specifically, the board stated: "In sum, the [u]nion has not established animus necessary to a prima facie case of discriminatory treatment under [MERA]. Discipline was neither threatened nor imposed and no change of substance to the [city's] existing policies was effected. As such, we dismiss the [u]nion's complaint."[7] (Emphasis omitted.) Although conceding that its claims are properly analyzed under *Wright Line*, the union contends that the board applied the wrong legal standard in deciding whether the union had met its prima facie burden with respect to the third prong of the *Wright Line* framework. Specifically, the union contends that it may meet its obligation to prove antiunion animus simply by demonstrating that the employer's conduct could objectively be viewed as tending to coerce employees from engaging in protected union activities, without needing to demonstrate that the employer's conduct actually coerced employees from engaging in protected union activities. For reasons we will discuss at greater length, we reject the union's claim because it is fundamentally inconsistent with the *Wright Line* test, which the union had relied upon before the board, the trial court, and this court as the appropriate framework against which to measure its factual claims in this case.

Before addressing the propriety of the union's claim, it is helpful to first review the function and applicability of the *Wright Line* test. *Wright Line* is "the test the [NLRB] uses when an employer has discharged (or disciplined) an employee for a reason assertedly unconnected to protected activity—for example, poor performance. In such cases, the central question is whether the [adverse employment action] was motivated by anti-union animus, and the [NLRB] uses variations on *Wright Line*'s burden-shifting framework to test the veracity and sufficiency of the employer's explanation." (Emphasis omitted.) *Shamrock Foods Co.* v. *N.L.R.B.*, 346 F.3d 1130, 1135–36 (D.C. Cir. 2003); see *N.L.R.B.* v. *RELCO Locomotives, Inc.*, supra, 734 F.3d 780 ("[t]he so called *Wright Line* analysis is applied when an employer articulates a facially legitimate reason for its termination decision, but that motive is dis-

puted"). Importantly, application of this framework is normally limited to situations in which the employer's motive is suspect, and the employer has taken certain delineated adverse employment action, such as discipline or discharge, against an employee. See *N.L.R.B.* v. *White Oak Manor*, 452 Fed. Appx. 374, 383 (4th Cir. 2011) ("invocation of the *Wright Line* analysis is appropriate *only* in situations where the employer's motive is at issue, such as cases where the employee claims that the employer took action against him for engaging in protected activity and the employer claims that it took action against the employee for some other reason" [emphasis added; internal quotation marks omitted]); *A & G, Inc.*, 351 N.L.R.B. 1287, 1302 (2007) ("[u]nder the [NLRB's] *Wright Line* analysis, the General Counsel must prove that an adverse employment action occurred"). The test has generally not been applied in circumstances where the employer's motive is undisputed or irrelevant. See *Shamrock Foods Co.* v. *N.L.R.B.*, supra, 346 F.3d 1136 (*Wright Line* analysis unnecessary if employer's motive is "not at issue"). The test is also generally not used in cases in which the employee or union has not alleged adverse employment action, but instead simply claims that the employer's conduct tended to interfere with, restrain, or coerce employees in the exercise of protected rights. See *N.L.R.B.* v. *Air Contact Transport Inc.*, 403 F.3d 206, 213 (4th Cir. 2005) ("the issue is not the label placed on the employer's action, but whether the action tends to coerce [or not]").

The standard advanced by the union, on the other hand, entails determining whether "under all the existing circumstances, the [employer's] conduct has a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced." *New York University Medical Center* v. *N.L.R.B.*, 156 F.3d 405, 410 (2d Cir. 1998). By its very language, this test is inconsistent with *Wright Line* because it considers an employer's motive, i.e., antiunion animus, to be irrelevant. See *Medeco Security Locks, Inc.* v. *N.L.R.B.*, 142 F.3d 733, 744–45, 747 (4th Cir. 1998). Conduct that tends to coerce or intimidate employees includes, inter alia, "threats of discharge in retaliation for union activity . . . grants or promises to grant benefits to discourage employee support for a union . . . the cultivated impression that employees' union activities are under surveillance . . . coercive interrogations of employees concerning their union activity . . . and, in certain circumstances, threats of plant closure." (Citations omitted; internal quotation marks omitted.) *Kinney Drugs, Inc.* v. *N.L.R.B.*, 74 F.3d 1419, 1427 (2d Cir. 1996).

The federal courts view these two analytical frameworks as distinct and applicable to claims of manifestly different natures. *Wright Line*, and its attendant requirement that a complainant demonstrate the existence of antiunion motive, is most often applied to

claims arising under § 8 (a) (3) of the NLRA, codified at 29 U.S.C. § 158 (a) (3), which provides that "[i]t shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." In other words, the *Wright Line* standard typically applies in cases in which the union or employee has alleged that the employer took specific adverse employment action against the employee to encourage or discourage membership in a labor organization.[8]

The standard advanced by the union, in contrast, is typically applied to claims that an employer's conduct is, regardless of any specified adverse employment action or the employer's intent, inherently coercive in violation of § 8 (a) (1) of the NLRA, codified at 29 U.S.C. § 158 (a) (1), which provides that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . ." These two provisions are not coterminous; *Metropolitan Edison Co.* v. *N.L.R.B.*, 460 U.S. 693, 698 n.4, 103 S. Ct. 1467, 75 L. Ed. 2d 387 (1983); and the nature of the violation therefore determines which analytical framework applies. *Independent Electrical Contractors of Houston, Inc.* v. *N.L.R.B.*, 720 F.3d 543, 553 (5th Cir. 2013). Notably, "[a]nti-union animus or discriminatory motive are essential proof for § 8 (a) (3). . . . For a violation of § 8 (a) (1), however, an employer's motive is irrelevant." Id.; see *Medeco Security Locks, Inc.* v. *N.L.R.B.*, supra, 142 F.3d 747 ("[u]nlike violations of § 8 [a] [3], an employer's anti-union motivation is not a required element of § 8 [a] [1]").[9]

In sum, *Wright Line* generally applies in federal cases brought pursuant to § 8 (a) (3) of the NLRA where the employer is alleged to have taken adverse employment action against an employee and the factual inquiry focuses on the employer's intent in doing so. The *Wright Line* test is generally not used in § 8 (a) (1) cases in which the employee or union claims that the employer's conduct (which may not rise to the level of an adverse employment action) has a tendency to coerce employees from engaging in protected activities regardless of its intent.

This dichotomy can be difficult to transfer to claims brought under MERA, our state statute, because MERA does not contain an analog to § 8 (a) (3) of the NLRA. Thus, claims alleging discrimination and retaliation under MERA are ordinarily raised and considered pursuant to § 7-470 (a) (1), which, as previously noted, mirrors the language of § 8 (a) (1) of the NLRA. See *In re Bristol*, Conn. Board of Labor Relations, Decision No. 4626 (December 18, 2012); *In re Woodbridge Board of Education*, Conn. Board of Labor Relations, Decision No. 4565 (November 15, 2011); *In re Hartford*, Conn.

Board of Labor Relations, Decision No. 3785 (August 22, 2000) ("[s]ection 7-470 [a] [1] of [MERA] prohibits an employer from harassing and retaliating against an employee for engaging in protected, concerted activity"). As the previous discussion suggests, determining the proper standard requires examining the nature of the claim. Although this task is generally simpler under the NLRA due to the fact that different claims typically correspond to specific provisions of the statute, the task is more nuanced under MERA where claims of two distinct natures—that the employer impermissibly retaliated or that the employer's conduct objectively tended to coerce—may both be brought under § 7-470 (a) (1). Caution must therefore be exercised not to indiscriminately apply the standard generally applicable to claims arising under § 8 (a) (1) of the NLRA to all claims arising under § 7-470 (a) (1) of MERA simply because their language is analogous.

By electing to cast its claims as falling under the *Wright Line* standard before the board, the trial court, and this court, the union may not attempt to import a test that is fundamentally inconsistent with the *Wright Line* standard. By arguing the applicability of *Wright Line* to the board, the union necessarily directed the board's attention to two fundamental questions: (1) whether the city had taken adverse employment action against any of its members, and (2) whether the city's conduct was motivated by antiunion animus. With respect to the first question, the board found that "[d]iscipline was neither threatened nor imposed and no change of substance to the [city's] existing policies was effected." With respect to the second question, the board refused to draw factual inferences from the city's conduct, as urged by the union, that would be necessary to conclude under *Wright Line* that the city's actions were motivated by antiunion animus.

We recognize that if the union had pursued its claim under § 7-470 (a) (1) like a claim raised under § 8 (a) (1) of the NLRA, the board's focus would rightly have turned to whether the city's conduct had the tendency to coerce employees from exercising the rights protected by MERA regardless of any formal adverse employment action or antiunion animus.[10] The board, however, decided the case on the theory on which the union advanced it. Accordingly, the board cannot now be faulted for not applying a standard that is inconsistent with the overall standard the union urged it to use in adjudicating its claim of discrimination. Indeed, our review of the administrative record demonstrates that the union never relied upon the theory that it now advances on appeal. Because it is a well accepted principle of appellate procedure that a party "may not try its case on one theory and appeal on another"; *Mellon* v. *Century Cable Management Corp.*, 247 Conn. 790, 799, 725 A.2d 943 (1999); we conclude that the board did not apply an improper standard in deciding the

union's claims.

## II

Having determined that the board did not improperly fail to apply the standard claimed by the union, we now turn, pursuant to the *Wright Line* framework, to the union's second claim that substantial evidence did not support the board's determination that the union did not prove the existence of antiunion animus on the part of the city. We begin our analysis by setting forth the relevant standard of review.

"[The] so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence . . . has said that it is something less than the weight of the evidence, and [that] the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . [T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . As with any administrative appeal, our role is not to reexamine the evidence presented to the council or to substitute our judgment for the agency's expertise, but, rather, to determine whether there was substantial evidence to support its conclusions." (Citations omitted; internal quotation marks omitted.) *Fairwind CT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 689–90, 99 A.3d 1038 (2014).

In advancing its argument that substantial evidence did not support the board's conclusion that the city lacked antiunion animus, the union relies on a number of incidents involving city supervisors and employees. Specifically, it draws our attention to Torre's telephone call to Taylor regarding Taylor's grievance, Torre's direction to DeJesus to wash his work vehicle, Torre's disclosure to employees that DeJesus' employment previously had been terminated, Torre's rendition of the song, "Back Stabbers," in the presence of other employees, and Alvord's letter to Giddiens reminding him that, per department policy, union members must request preapproval to conduct union business during work hours. The union contends that the nature of these interactions, as well as their timing, compels the conclusion that the city's allegedly improper actions were motivated by antiunion animus. We do not agree.

We turn first to the union's claim that Torre had threatened Taylor during a telephone call about the grievance Taylor had filed. Specifically, the union claims, relying solely on its own interpretation of his comments, that Torre's statement to Taylor to " 'not go down that road' " was "clearly" a threat in response to Taylor's grievance.

This argument fails for two reasons. First, even if Torre's comments can be construed as threatening, the union has cast its claims as alleging harassment, discrimination, or retaliation on the basis of protected activities. See part I of this opinion. Thus, to prevail on this claim, the union must demonstrate that Torre took some adverse employment action against Taylor. Here, the administrative record contains substantial evidence supporting the conclusion that no adverse action occurred. Taylor was neither threatened with nor subjected to discipline, and Torre's ambiguous statement that Taylor should not " 'go down that road' " does not constitute harassment sufficient to qualify as an adverse employment action. Consequently, the union failed to establish a predicate fact essential to the type of claim that it raised.

Second, even if Torre's comments could constitute an adverse employment action, substantial evidence exists in the administrative record to support the conclusion that they were not the product of antiunion animus. Specifically, Torre testified that he and Taylor had socialized in the past as friends and had previously discussed personal and family issues, and that the only reason he telephoned Taylor was because he was "taken aback" that someone he considered a friend would label him a racist. As the fact finder, it was within the province of the board to infer from this testimony that Torre's interaction was not the result of antiunion sentiment, but arose from a personal disagreement with Taylor that was related to their friendship. Accordingly, we conclude that the board's factual determination with respect to this issue was supported by substantial evidence.

The union next asserts that Torre's directive to DeJesus to wash his work vehicle establishes that Torre possessed antiunion animus because, at the time that he issued the directive, Torre allegedly knew that the vehicle was clean. As with the previous claim, this claim also fails for want of an adverse employment action. The board specifically found that even if the evidence were unequivocal that Torre directed DeJesus to wash a vehicle that he knew was already clean, "no disciplinary consequences followed DeJesus' refusal to obey Torre's directive." We agree that because DeJesus ultimately suffered no adverse effects from Torre's directive, in that he neither washed the vehicle again nor was he disciplined for refusing to do so, substantial evidence supported the board's conclusion that Torre's conduct

did not constitute harassment, discrimination, or retaliation sufficient to violate § 7-470 (a) (1).

Assuming, however, that Torre's directive did constitute an adverse employment action, we agree with the board's conclusion that "the record . . . is insufficient to establish that Torre knowingly ordered DeJesus to wash a clean truck . . . ."[11] Torre testified that he directed DeJesus to wash his truck because he genuinely believed that it was dirty. The board was free to credit this testimony, which directly negates any inference that Torre acted out of antiunion animus. Moreover, the board was not required to credit DeJesus' testimony that Torre complained to DeJesus about the grievance filed against him at the same time that he had directed DeJesus to wash the vehicle.[12] See *Frank* v. *Dept. of Children & Families*, 312 Conn. 393, 412, 94 A.3d 588 (2014) ("[a]n administrative agency is not required to believe any witness" [internal quotation marks omitted]). Because the union's argument essentially requires the board to resolve the testimony of competing witnesses in the union's favor, and the board is not required to do so, we have no basis to disturb the board's determination that Torre was not acting with antiunion animus when he directed DeJesus to wash his vehicle.

The union next claims that Torre's antiunion animus was evidenced by his disclosure to other employees that the city previously had terminated DeJesus' employment because he took money from a customer, and that the city reinstated him because of a "technicality." Although this conduct may reflect a negative attitude toward DeJesus, it is also plausible that the incident merely represents idle gossiping between employees. In light of these two competing interpretations of the same incident, the deferential standard we apply in administrative appeals requires that we defer to the board's factual determination that Torre's conduct was not indicative of the kind of animus necessary to satisfy the requirements of *Wright Line*.

We also defer to the board's reasonable conclusion that Torre's rendition of the song, "Back Stabbers," did not constitute evidence of antiunion animus. Nothing in the administrative record remotely suggests that this act was intended to serve as an expression of Torre's personal feelings toward union members. Torre's testimony that he was simply singing along with the song as it played on the radio—testimony that is undisputed by the union—provides a sound basis from which the board could find that the act carried no significant meaning.

We similarly discern no compelling basis in the administrative record to conclude that Alvord's letter to Giddiens reminding him that union members must seek preapproval for time off for any reason, including the performance of union business during work hours,

evidenced antiunion animus. To the contrary, Alvord testified that the policy requiring preapproval for time off is applicable to all employees, including nonunion employees, and is necessary so that the department can properly plan for employees to be away from their work responsibilities. Moreover, given the apparent confusion between union officers and department supervisors as to the applicability of the policy, which was clearly evidenced by Torre and DeJesus' disagreement during the snowplow meeting, we agree with the board that Alvord's letter served the legitimate and reasonable purpose of clarifying the scope of the attendance policy and avoiding future misunderstandings.

Finally, we are not persuaded by the union's contention that the timing of each of these incidents necessarily gave rise to an inference of antiunion animus. Indeed, it would "swallow the burden and entire purpose of the *Wright Line* analysis"; *N.L.R.B.* v. *Arkema, Inc.*, 710 F.3d 308, 323 (5th Cir. 2013); if temporal congruity between protected activity and adverse employment action alone could satisfy the union's burden of proving antiunion animus.

In sum, we conclude that substantial evidence supported the board's determination that the union failed to establish adverse employment action and that the city's conduct was motivated by antiunion animus on the part of city supervisors. We therefore conclude that the trial court properly dismissed the union's appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 7-468 (a) provides: "Employees shall have, and shall be protected in the exercise of, the right of self-organization, to form, join or assist any employee organization, to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from actual interference, restraint or coercion."

[2] The union also alleged that Torre had "harass[ed] the President of the Union . . . not to eat in a lunchroom or he would be disciplined . . . ." This allegation was not addressed by either the board or the court, and the union does not raise it on appeal.

Additionally, although the union referenced Torre's rendition of the song "Back Stabbers" in its prohibited practice complaint, it makes no argument on appeal that this conduct by itself constituted a violation of § 7-470 (a) (1). Rather, the union argues that this act provided a basis from which the board should have found the existence of antiunion animus with respect to other conduct alleged to violate § 7-470 (a) (1).

[3] Although the union cited to §§ 7-467 through 7-470 of MERA in its complaint, the board's inquiry focused solely on whether the union violated § 7-470 (a) (1). Neither the union nor the city challenge this aspect of the board's decision, and we therefore limit our analysis to determining whether substantial evidence supported the board's determination that the city did not violate § 7-470 (a) (1).

[4] The union also claims that the trial court erroneously found that the union had conceded that substantial evidence supported the board's decision. Because we conclude that substantial evidence did, in fact, support the board's decision, we need not address this issue.

[5] 29 U.S.C. § 158 (a) (1) provides in relevant part that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . ."

[6] See, e.g., *In re Bridgeport Housing Authority*, Conn. Board of Labor Relations, Decision No. 4754 (August 7, 2014); *In re Bristol*, Conn. Board of Labor Relations, Decision No. 4626 (December 18, 2012); *In re Woodbridge Board of Education*, Conn. Board of Labor Relations, Decision No. 4565 (November 15, 2011).

[7] We read the board's decision in this regard to constitute a conclusion that with respect to the third prong (1) the city did not harbor antiunion animus, and (2) any conduct it engaged in was not motivated by antiunion animus.

We also note that the board's recitation of the *Wright Line* test in its decision is incomplete because its discussion of the third prong omits the critical notion that the employer's antiunion animus, if any, must be a motivating factor in the adverse employment action. Instead, the board treats the causal connection between the antiunion animus and the adverse employment action as an affirmative defense. Our review of federal cases, which we find persuasive, reveals that the causal connection between the antiunion animus and the adverse employment action must be demonstrated as part of the complainant's prima facie case. See *Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.* v. *N.L.R.B.*, 414 F.3d 158, 161 (1st Cir. 2005) (prima facie case under *Wright Line* must demonstrate, inter alia, "that the employer harbored animus toward unions, and . . . a causal link between the anti-union animus and the termination"); *Huck Store Fixture Co.* v. *N.L.R.B.*, 327 F.3d 528, 533 (7th Cir. 2003) (general counsel must demonstrate "a causal connection between the animus and the implementation of the adverse employment action"); *N.L.R.B.* v. *Clinton Electronics Corp.*, 284 F.3d 731, 738 (7th Cir. 2002) (NLRB must find "that the employer harbored animus toward union activities, and that there was a causal connection between the animus and the decision to discipline").

[8] Section 8 (a) (3) cases typically involve an employer discriminating or retaliating against an employee for engaging in activities related to or arising out of his or her union membership. In some cases, however, employees may engage in protected activities that do not require membership in a union, such as collectively raising workplace safety concerns to an employer. In these situations, the claim is often pursued under § 8 (a) (1) of the NLRA, which employs broader language and does not require that the employer's conduct be for the purpose of discouraging membership in a labor organization. In these limited circumstances, regardless of whether the claim is brought pursuant to § 8 (a) (3) or § 8 (a) (1), *Wright Line* is the appropriate analytical framework to assess the complainant's claim. See *Holder Construction Co.*, 327 N.L.R.B. 326, 326 (1998) (applying *Wright Line* to § 8 [a] [1] claim that employer discharged employees for raising safety concerns about work equipment).

[9] Although violations of § 8 (a) (3) of the NLRA ordinarily require a showing of antiunion animus under *Wright Line*, and violations of § 8 (a) (1) of the NLRA usually do not require inquiring into an employer's motive, exceptions to these general principles do exist. For example, *Wright Line* is not applicable in cases involving § 8 (a) (3) if the employer admits that it discharged an employee for engaging in certain conduct, but disputes that the conduct was protected by the statute. See *N.L.R.B.* v. *Tri-County Manufacturing & Assembly, Inc.*, 76 Fed. Appx. 1, 6 (6th Cir. 2003) ("In the present case, the conduct that [the employer] claims justifies the termination is the very same conduct that the [NLRB] determined to be protected activity. Accordingly, *Wright Line* is not instructive."). Moreover, the NLRB has acknowledged that in a small category of § 8 (a) (1) claims that "[turn] on" employer motivation, the *Wright Line* framework should be applied. See *Wright Line*, supra, 251 N.L.R.B. 1089.

[10] The NLRB has recognized that, as a matter of logic and statutory construction, a violation of § 8 (a) (3) of the NLRA would necessarily constitute a violation of § 8 (a) (1). See *Hospital Cristo Redentor, Inc.* v. *N.L.R.B.*, 488 F.3d 513, 518 n.1 (1st Cir. 2007) ("[a] violation of [§] 8 [a] [3] of the [NLRA] necessarily interferes with the exercise of statutory rights, and therefore derivatively violates [§] 8 [a] [1] of the [NLRA]"). The NLRB has referred to such a violation as "derivative" and, thus, not independent of the other sections of the NLRA. See *Fun Striders, Inc.* v. *N.L.R.B.*, 686 F.2d 659, 661 (9th Cir. 1981) ("Section 8 [a] [1] [of the NLRA] was intended as a general definition of employer unfair labor practices. Violations of it may be either derivative, independent, or both. . . . A derivative violation is premised on a violation of [§ 8 (a) (2) through (5) of the NLRA, codified at 29 U.S.C. § 158 (a) (2) through (5)], which establish more specific categories of employer unfair labor practices. In general, a violation of one of these

provisions will support a finding that [§] 8 [a] [1] has been derivatively violated.").

[11] The union quibbles with this language and asks, "how could one not 'knowingly' order someone to do something?" It is clear, however, that the board's use of the word "knowingly" was meant to convey that it found the union's evidence insufficient to establish that Torre ordered DeJesus to wash a truck *that he knew was clean.*

[12] Although the union makes the conclusory assertion that the board "blatantly disregarded the evidence and testimony before it," we find no indication in the record that the board disregarded any of the union's evidence, let alone that it did so "blatantly." On the contrary, we construe the board's statement that the evidence before it was insufficient to establish that Torre knowingly ordered DeJesus to wash a clean truck as a direct assessment of the union's evidence and a determination that it did not establish the union's prima facie case.

---